**SIEBER & CALICUTT, INC.,**
Appellant/Cross–Appellee,

v.

**La GLORIA OIL & GAS COMPANY,**
Appellee/Cross–Appellant.

No. 12–00–00123–CV.

Court of Appeals of Texas,
Tyler.

May 23, 2001.

Rehearing Overruled July 23, 2001.

Howard W. Britain, Tyler, for appellant.

Michael M. Meyer, Jack G. Carnegie, John L. Hagan, Jones Day Reavis & Pogue, Houston, for appellee.

Panel consisted of DAVIS, C.J., WORTHEN and GRIFFITH, JJ.

WORTHEN, Justice.

Sieber & Calicutt ("Sieber") appeals the trial court's award of $812,154.39 to La Gloria Oil & Gas Company ("La Gloria") following a bench trial determining its liability under an indemnification agreement for the wrongful death of a La Gloria employee. In six issues, Sieber contends the trial court erred when it determined that an indemnity agreement existed at

the time of the employee's death, that La Gloria had been grossly negligent in its employee's death, and that Sieber's negligence had been equal to that of La Gloria's. In two cross-issues, La Gloria argues the trial court erred when it did not award attorneys' fees to La Gloria in either the underlying employee's negligence action or this indemnification suit. We affirm.

## BACKGROUND

On April 28, 1993, Donnie Pyron died of severe burns and inhalation injuries caused by his fall into four-and-a-half feet of 186–degree water in an off-line separator at the La Gloria refinery in Tyler.[1] Pyron was an electrician at the refinery. His widow and children sued La Gloria for his wrongful death. La Gloria settled the suit brought by Pyron's survivors for $1,250,000.00 ("$1.25M"). La Gloria then filed the instant lawsuit against Sieber seeking indemnification for the funds it had paid in the Pyron settlement.

Sieber entered into a contract on July 1, 1991, to provide maintenance services at the La Gloria refinery. This contract, identified as LA–002545, included an indemnification section, the first paragraph of which stated:

CONTRACTOR agrees to hold harmless and unconditionally indemnify LA GLORIA its directors, officers, agents, representatives and employees against and for all liability, costs and expenses, claims and damages which LA GLORIA at any time suffer or sustain or become liable for by reason of any accidents, damages or injuries either to the persons or property or both, of CONTRACTOR, its subcontractors and suppliers, or to the persons or property of LA GLORIA, its subcontractors and suppliers, arising in any manner from the Work performed hereunder, including but not limited to any negligent act or omission of LA GLORIA, its directors, officers, agents, representatives or employees, provided however, that if the negligence of LA GLORIA shall be found to be greater than or equal to the comparative negligence of the CONTRACTOR, then the CONTRACTOR shall only be liable to LA GLORIA to the extent of the CONTRACTOR'S own negligence.

This contract expired by its express terms on July 1, 1992. However, after July 1, 1992, Sieber continued to provide maintenance services at the refinery. It continued to invoice La Gloria under the LA–002545 contract number, and La Gloria continued to pay Sieber's invoices for services.

Under this contract, Sieber based its maintenance operations at the refinery in the Brown & Root building. Heat for this building was provided by steam. To remove the steam condensate remaining from the heating process at the Brown & Root building, Sieber had run a steam condensate line to three different locations at the refinery only to have La Gloria employees complain of mud created by the steam condensate at each of the three locations. Finally, on November 24 and 25, 1992, Sieber employee Olin Judd ran the steam condensate line into the off-line La Gloria separator. Judd consulted Keith Head, an environmental operator for La Gloria, about where to put the hole in the separator for the steam condensate line to run into it. Following this opera-

---

1. The purpose of the separator was to remove oil from the refinery's waste water before the waste water was put into the city of Tyler's sewer system. Testimony during the trial showed that this particular separator was off-line and therefore not in use at the time of Pyron's death.

tion, the La Gloria employees had no more complaints about the condensate line coming from the Brown & Root building. Testimony at trial also showed Sieber invoiced La Gloria under LA–002545 for its labor and materials to run the steam condensate line into the off-line separator. La Gloria paid this invoice.

Six months later, on April 28, 1993, a pumping station flow switch failed and threatened to shut down some of the refinery's operations. Pyron sought to inspect the flow switch at the off-line separator to determine if it could be scavenged in order to repair the failed flow switch. Following refinery procedure, he contacted Head to meet him at the off-line separator. Head testified that he arrived at the off-line separator five to ten minutes after being called by Pyron. Head found Pyron inside the southernmost manway cover of the off-line separator, bobbing up and down in four-and-a-half feet of 186–degree water. After calling for assistance from A.J. Pearson, Head was able to pull Pyron from the separator. Pyron died later in the day. The death certificate stated his death had been caused by "thermal burns" and "inhalation injuries."

Over the following two days, a La Gloria joint safety committee (made up of La Gloria management and labor representatives) investigated Pyron's death. The committee issued the following incident report:

### SAFETY COMMITTEE INCIDENT REPORT

#### KNOWNS AND SPECIFICS

1. There were no eye witnesses to the actual accident.
2. The accident occurred at the extreme south manway 4'6" X 5'6%" opening.
3. According to James Gathright, the manway door (cover) was found upside down inside the south compartment of the Separator where Donnie was found, along with Donnie's hardhat.
4. Donnie (Pyron) was at the scene to collect data off of the float switch.
5. The west hinge pin of the cover was missing. The east eye bolt was completely missing (hinge part) from the angle iron support of the hinge pin assembly.
6. All of the large manway cover hinge pin assemblies had some degree of damage.
7. The manway where Donnie was found is closest to the float switch.
8. All of the manway covers were in place prior to the accident.
9. There was no oil on top of the Separator prior to the accident. The area was not barricaded, nor were there any warning signs posted.
10. No maintenance work orders had been issued prior to the accident.
11. No locking latches were found on the manway cover.

Following a bench trial on La Gloria's suit for indemnification, the trial court made the following findings of fact and conclusions of law:

1. The contract (LA–002545) between Plaintiff and Defendant herein continued in full force and effect from November 1992 through April 1993.
2. Plaintiff and Defendant continued to act and perform under the contract in question, relying on its continuation until it was formally extended in writing.
3. Both parties performed under the contract, each to its own detriment

and had reason to rely on the full performance by the other party.

4. A non-existent contract cannot be extended, as this contract was properly extended in writing in April of 1993.

5. There was a significant and reasonable risk that Plaintiff (La Gloria) would have been found grossly negligent in the underlying lawsuit.

6. The settlement by La Gloria in the underlying law suit was reasonable including the gross amount of the settlement.

7. La Gloria was negligent including its failure to see that the API separator in question was properly secured.

8. Sieber and Calicutt was negligent including the running of the hot condensate line into an unsecured and unsafe separator.

9. The injuries and death in question "arose from" the work of Sieber & Calicutt.

10. The injuries and death in question "arose from" the negligence of both La Gloria and Sieber & Calicutt.

11. The indemnity provision of the contract in existence and under which the parties were performing and on which both parties were relying was enforceable.

12. The indemnity provision in question provides a lower causal connection than "proximate cause" or "producing cause" through its provision for "arising in any manner . . ."

13. The negligence of La Gloria was equal to that of Sieber & Calicutt.

14. The amount of attorneys fees in the underlying suit and the pres-ent cause of action were not proved.

15. The attorney's fees in the underlying case may have been reasonable in a case involving such an extremely large potential plaintiff's verdict, but the amount of time actually expended was not proved in this trial nor was the necessity of the over $118,000 and over $27,000 time and expenses.

16. The court cannot make an award of attorney's fees and expenses as such fees, costs, or expenses are only recoverable under the contract if they are proven to be reasonable and necessary.

17. Plaintiff is entitled to recover one half of the amount paid in settlement in the underlying suit on which this cause is based which would be the amount of six hundred twenty-five thousand and NO/100 dollars ($625,000.00).

18. Plaintiff is entitled to prejudgement interest in the amount of one hundred eighty-seven thousand one hundred fifty-four and thirty-nine/100 dollars ($187,-154.39) along with post judgement interest on the amount due to Plaintiff.

Sieber timely filed a notice of appeal. La Gloria followed with a cross notice of appeal.

### STANDARD OF REVIEW

In all of their issues and cross-issues, Sieber and La Gloria challenge specific findings of fact and conclusions of law made by the trial court. Findings of fact entered in a case tried to the bench are of the same force and dignity as a jury's finding. *International Bank of Commerce–Brownsville v. International Energy Dev. Corp.*, 981 S.W.2d 38, 43 (Tex.

App.—Corpus Christi 1998, pet. denied), *cert. denied,* 528 U.S. 1137, 120 S.Ct. 982, 145 L.Ed.2d 932 (2000). The trial court's findings are reviewable for legal and factual sufficiency of the evidence to support them. *Id.*

When an appellant challenges the legal sufficiency of the evidence to support an adverse finding, we consider only the evidence and inferences, when viewed in their most favorable light, that tend to support the finding, and disregard all evidence and inferences to the contrary. *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex.1994). When reviewing a judgment to determine factual insufficiency of the evidence, this court must consider and weigh all of the evidence, and should set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). The trial court, as trier of fact and the sole judge of the credibility of the witnesses, is free to draw its own deductions from all the evidence, and is not bound by the testimony of any particular witness. *Matter of Estate of McGrew,* 906 S.W.2d 53, 57 (Tex.App.—Tyler 1995, writ denied). Once the trier of fact makes its findings, those findings are binding on an appellate court unless they are supported by no evidence or they are so against the great weight of the evidence as to be manifestly unjust. *Id.*

### EXTENSION OF MAINTENANCE CONTRACT

In its first issue, Sieber contends that the maintenance contract between Sieber and La Gloria had expired by its own terms on July 1, 1992 and was not in effect on April 28, 1993. La Gloria responds that it was uncontroverted between the parties that Sieber continued to perform maintenance services for La Gloria after July 1, 1992, and invoiced La Gloria under the contract number LA–002545. Further, the evidence showed that this service contract was extended in a letter agreement between Sieber and La Gloria dated November 15, 1993 through May 15, 1994.

Even when an exact date of performance is specified in the contract, this provision can be waived by the parties. *Intermedics, Inc. v. Grady,* 683 S.W.2d 842, 846 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). An extension of time for performance may be implied as well as express. *Id.* When the exact duration of an extension of time is not express, the law will imply a reasonable time. *Cotten v. Deasey,* 766 S.W.2d 874, 877 (Tex. App.—Dallas 1989, writ denied). The extension of a term of a contract is the extension of all of its provisions. *Id.; see also Morgan v. Stover,* 511 S.W.2d 362, 365 (Tex.Civ.App.—Eastland 1974, writ ref'd n.r.e.). The parties here continued to perform under the July 1, 1991 maintenance contract even after it had expressly expired on July 1, 1992. Further, their extension of the July 1, 1991 contract by letter agreement on November 15, 1993, was sufficient evidence to support the trial court's finding that the maintenance contract of July 1, 1991, was in effect on April 28, 1993. We hold the indemnity section of the July 1, 1991 contract between Sieber and La Gloria was in effect on April 28, 1993. Sieber's issue one is overruled.

### REASONABLENESS OF SETTLEMENT WITH PYRON FAMILY

In its second issue, Sieber contends that the trial court erred in determining that there was a significant and reasonable risk that La Gloria would have been found grossly negligent in the Pyron family's lawsuit and that La Gloria's settlement with the Pyron family was reasonable. The test for gross negligence contains both an objective and a subjective

component. *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 21–22 (Tex.1994). Subjectively, a defendant must have actual awareness of an extreme risk created by his or her conduct. *Id.* Objectively, the defendant's conduct must involve an extreme degree of risk, a threshold significantly higher than the objective reasonable person test for negligence. *Id.* An appellate court must sustain a gross negligence finding if legally sufficient evidence shows both that the complained of act or omission was likely to result in serious harm and that the defendant was consciously indifferent to the risk of harm. *Mobil Oil Corp. v. Ellender,* 968 S.W.2d 917, 922 (Tex.1998).

Our review of the joint safety committee incident report listed above reveals compelling facts and circumstances to establish both the subjective and objective prongs of gross negligence. The south manway cover which fell into the separator with Pyron was in an extreme degree of disrepair. The west hinge pin of the manway cover was missing. The east eye bolt of the manway cover was completely missing. All of the hinge pin assemblies for the manway cover were damaged. At trial, the parties stipulated that the south manway cover where Pyron fell into the off-line separator had been in this extreme damaged condition for three years prior to the time of Pyron's death. The joint safety committee incident report further went on to establish that there were no locking latches on the south manway cover. Further, the report disclosed that this area had not been barricaded nor were there any warning signs posted.

■■■■ John Boney, a member of the joint safety committee and chairman of the union safety committee, testified that La Gloria had been lax in its safety policy before Pyron's death. He described La Gloria as having the attitude of reacting to a tragedy such as Pyron's death rather than trying to prevent one from happening to begin with. Paul Jones, part of La Gloria's supervisory management, testified that La Gloria had made only half-hearted attempts to repair the south manway cover for the subject separator over the three years prior to Pyron's death. Michael Johnson, the senior safety supervisor for La Gloria, conceded that La Gloria had sole responsibility for the off-line separator in terms of safety, maintenance, and warning of hazards. We hold there was sufficient evidence to establish the subjective element of gross negligence in that La Gloria had actual awareness of an extreme risk. We hold that the objective element was also satisfied because La Gloria had failed to warn Pyron about the off-line separator and its defective manway cover, and this failure involved an extreme degree of risk to Pyron. *See Mobil Oil Corp.,* 968 S.W.2d at 922–25.

■■■■ Determining whether a settlement of a wrongful death case is reasonable involves experience and specialized knowledge. *See Burrow v. Arce,* 997 S.W.2d 229 (Tex.1999). An attorney must review and analyze, among other things, the underlying facts, the identity of the defendant, the damage elements available to a plaintiff, the specific injuries or losses incurred by a plaintiff, the settlement amounts received in similar cases, the complexity of the case, as well as the strength and resources of the opposing counsel. John Hagan, a Houston attorney, testified that the $1.25M settlement that La Gloria reached in the underlying lawsuit with the Pyron family was reasonable. Hagan's testimony, along with the evidence established at trial, met the *Arce* factors. We have already reviewed the underlying liability issues and damage elements above. Ron Chapman, vice-president for La Gloria, testified that Pyron

was a devoted family man who attended church and was loved in his community. He further testified that he was well-liked by his colleagues at work. Chapman explained that the day Pyron died had been his wife's birthday and that Pyron had sent flowers to her which she received following his deadly fall into the separator. Hagan testified that a similar wrongful death case in Harris County, the venue for the Pyron family's lawsuit, had been settled for $1M dollars. Hagan further testified that the underlying lawsuit by the Pyron family had involved numerous defendants which added to the complexity of the case. Finally, Hagan testified that George Chandler, the attorney for the Pyron family, had a stellar reputation for winning large verdicts in this type of case with these types of facts. The evidence before the trial court supported its determination that La Gloria's settlement with the Pyron family in the underlying lawsuit for $1.25M was reasonable. It is sufficient for the settling indemnitee to show a potential liability and that his settlement was reasonable, prudent and in good faith under the circumstances. *Fireman's Fund Ins. Co. v. Commercial Standard Ins. Co.,* 490 S.W.2d 818, 824 (Tex.1972); *overruled on other grounds by Ethyl Corp. v. Daniel Constr. Co.,* 725 S.W.2d 705, 708 (Tex. 1987). Sieber's issue two is overruled.

### SIEBER'S NEGLIGENCE

In issues three, four, five and six, Sieber contends that Pyron's death was not caused by any of its own negligence, that Pyron's death did not arise from any of its work, that its indemnity clause with La Gloria did not provide a lower causal connection than proximate cause, and that La Gloria was not entitled to recover from Sieber under the indemnity agreement. We will address these four issues together.

The elements of a negligence cause of action are a duty, a breach of that duty, and damages proximately caused by the breach of duty. *Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 477 (Tex.1995). The components of proximate cause are cause-in-fact and foreseeability. *Id.* The test for cause-in-fact is whether the negligent act or omission was a substantial factor in bringing about injury, without which the harm would not have occurred. *Id.* Foreseeability requires that a person of ordinary intelligence should have anticipated the danger created by a negligent act or omission. *Id.* at 478. It asks whether the injury might reasonably have been contemplated as a result of the defendant's conduct. *Id.*

Evidence during the trial showed that beginning on August 21, 1992, La Gloria began operating under a "management of change" procedure. This required that any changes in the structure or operation of the refinery had to be approved by La Gloria management. One of the considerations in establishing this procedure was the safety and health of the La Gloria employees.

Richard Keene, the foreman for Sieber throughout the period of its maintenance contract with La Gloria which began on July 1, 1991, testified that he did not receive the required approval under the "management of change" procedure from La Gloria to run the steam condensate line from the Brown & Root building to the off-line separator Pyron fell into. Keene explained that Chris Knotts was the maintenance supervisor for La Gloria and the member of management from whom he was required to seek approval to lay the subject steam condensate line. Keene admitted that Knotts never authorized him to run the steam condensate line from the Brown & Root building into the separator. Keene further testified that he never in-

formed La Gloria management in writing of this action. Knotts confirmed in his testimony that he had not given Sieber authorization to make this structural change in the refinery by running the steam condensate line from the Brown & Root building into the off-line separator where Pyron was killed. Keene testified that the steam condensate running into the off-line separator caused the 186–degree water. He further stated that this led to a dangerous condition for refinery workers, such as Pyron, who were unaware of its existence.

One who has created a dangerous condition may be liable even though not in control of the premises at the time of injury. *Science Spectrum, Inc. v. Martinez,* 941 S.W.2d 910, 912 (Tex.1997); *City of Denton v. Page,* 701 S.W.2d 831, 835 (Tex.1986). One who creates a dangerous condition owes a duty of due care. *Lefmark Mgmt. Co. v. Old,* 946 S.W.2d 52, 54 (Tex.1997). The evidence established that La Gloria was responsible for control and access to the separator that Pyron fell into. Yet Keene, the foreman responsible for Sieber's maintenance operation at the refinery, conceded that Sieber had created a dangerous condition for La Gloria employees by injecting the steam condensate into the off-line separator, causing the temperature of the four-and-a-half feet of standing water to reach a temperature of 186 degrees at the time of Pyron's death. Even though La Gloria had been negligent in its maintenance of the separator's manway cover and in warning its employees of the danger of the hot water, injection of the steam condensate into the separator was a substantial factor in bringing about the injury without which the harm would not have occurred. *See Doe,* 907 S.W.2d at 477. It is no defense that a third person's negligent act intervened to cause the injury to the plaintiff, if the new act cooper-ates with the still persisting original negligence of the defendant to bring about the injury. *J. Wigglesworth Co. v. Peeples,* 985 S.W.2d 659, 663 (Tex.App.—Fort Worth 1999, pet. denied). We hold there is sufficient evidence for the trial court's determinations that Sieber was negligent in injecting the steam condensate into the separator without authorization from La Gloria management and that negligence was a proximate cause of the death of Donnie Pyron. There is also evidentiary support for the trial court's finding that the negligence of La Gloria and Sieber were equal.

We next turn to Sieber's contention that the language in its indemnity agreement with La Gloria did not provide a lower causal connection than proximate cause through its provision for "arising in any manner." As shown above, there was evidence to support the trial court's finding that Sieber was negligent. Within that finding of negligence is the element of proximate cause. Under the subject indemnity clause, the element of proximate cause is wholly encompassed within the broad conceptual framework of "arising in any manner." *See McCarthy Bros. Co. v. Continental Lloyds Ins. Co.,* 7 S.W.3d 725, 730 (Tex.App.—Austin 1999, no pet.). Sieber's issues three, four, five and six are overruled.

### ATTORNEYS' FEES

In its two cross issues, La Gloria contends that the trial court abused its discretion by failing to award it contractual attorneys' fees in defending the underlying lawsuit brought by the Pyron family and the subsequent lawsuit against Sieber for indemnification. Sieber responds that the attorneys' fees were neither shown to be reasonable nor proven in either suit.

Allowance of attorneys' fees rests with the sound discretion of the trial

court and will not be reversed without a showing of abuse of that discretion. *Ragsdale v. Progressive Voters League,* 801 S.W.2d 880, 881 (Tex.1990). The test for abuse of discretion is whether the court acted without reference to any guiding rules and principles. *See Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985).

■ Factors that a fact finder should consider when determining the reasonableness of attorneys' fees include:

(1) the time and labor required, the novelty and difficulty of the question involved, and the skill required to perform the legal service properly;

(2) the likelihood ... that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

*Arthur Andersen & Co. v. Perry Equipment Corp.,* 945 S.W.2d 812, 818 (Tex. 1997), *citing* TEX. DISCIPLINARY R. PROF'L CONDUCT 1.04, *reprinted in* TEX. GOV'T CODE, tit.2, subtit. G app. (STATE BAR RULES, art. X, § 9).

■ Hagan testified on the reasonableness of La Gloria's attorneys' fees in both suits. He failed to testify as to the time and labor required. No billing records were produced. He did not describe the customarily charged fees in Harris or Smith Counties for similar legal services. He further testified that he had never tried a wrongful death suit to a jury and that he did not believe that La Gloria's lead attorney had either. He did not testify as to the nature and length of his law firm's relationship with La Gloria nor discuss the circumstances of the firm's employment. Further, he did not describe whether his law firm was precluded from other employment by taking this case. Because the trial court did not act arbitrarily in making its findings of fact and conclusions of law refusing to award attorneys' fees, it did not abuse its discretion. La Gloria's cross issues one and two are overruled.

The judgment of the trial court is *affirmed.*