DOUBLE DIAMOND, INC., Appellant,

v.

HILCO ELECTRIC COOPERATIVE, INC., Appellee.

No. 10–02–228–CV.

Court of Appeals of Texas, Waco.

Dec. 17, 2003.

Gregg Hill, Sims, Moore, Hill & Gannon, L.L.P., Hillsboro, Michael G. Cosby, Pakis, Giotes, Page & Burleson, P.C., Waco, for Appellant/Relator.

Martha McGregor, McGregor, McGregor & Carmichael, P.C., Hillsboro, Carlos

R. Soltero and Karen L. Watkins, McGinnis, Lochridge & Kilgore, L.L.P., Austin, for Appellee/Respondent.

Before Chief Justice GRAY, and Justice VANCE.

## OPINION

BILL VANCE, Justice.

This is a summary judgment case. Double Diamond, Inc. is the owner and developer of a subdivision called White Bluff, to which Hilco Electric Cooperative, Inc., a non-profit electric-cooperative corporation, provides electricity. TEX. UTIL.CODE ANN. § 161.001–.054 (Vernon 1998 & Supp.2004). A dispute arose when Double Diamond objected to Hilco's charges for extensions of distribution lines and other facilities required to provide electricity to White Bluff. The trial court granted Hilco's motion for summary judgment in the amount of $439,456.28. We will sustain Double Diamond's challenge, reverse the judgment, and remand the cause.

## BACKGROUND

In the early 1990s, Double Diamond began the development of White Bluff, a primarily residential subdivision, on land it owned in Hill County. Hilco, the sole provider of electricity to White Bluff, constructs underground and overhead electric distribution lines and other facilities and charges for this construction. For many years, Double Diamond and Hilco dealt with each other under an oral agreement concerning what charges Hilco would make for construction work to extend its distribution system. Randy Gracy, an officer of Double Diamond, worked out the arrangements with successive general managers of Hilco-first Sam Houston and later Joe Forman.

In August 1996, while Forman was still general manager, the parties signed a written agreement. The agreement provided for a substantial discount on charges Double Diamond would pay for construction to extend Hilco's distribution system in relation to the standard charges listed in Hilco's Tariff.[1] The monthly revenue Hilco derived from electricity use in White Bluff was so substantial that Hilco was willing to forego some of its usual charges for construction. The written agreement states that "upon termination [of the agreement], [Hilco's] approved tariffs will be in effect." The agreement expired by its express terms in August 1997, but in November 1997, the parties extended it by written agreement. The extension agreement states that the parties "agree to extend the terms of the [agreement] on the same terms and conditions … until August 2, 1998." When the extension expired in August 1998, Double Diamond inquired about extending it again but received no answer from Hilco. Summary judgment evidence shows, however, that from August 2, 1998, until August 23, 2000, the parties continued to deal with each other just as they had under the 1996 written agreement.

On August 23, 2000, Hilco's general manager since June 1999, Gerald Lemons, sent Double Diamond a letter which stated: "effective immediately, new construction or member requested upgrades … will be accomplished utilizing a Contribution–In–Aide to Construction (CIAC) method," which is the procedure in the Tariff for extending Hilco's distribution

---

1. Ordinarily, the schedule of a utility, municipally-owned utility, or electric cooperative containing all rates and charges stated separately by type of service, the rules and regulations of the utility, and any contracts that affect rates, charges, terms or conditions of service. *See* 16 TEX. ADMIN. CODE § 25.5(131) for this definition.

system.[2] In November 2000, Lemons sent another letter, this time demanding payment of $484,229.24 for work that had been performed to extend the distribution system since August 1998. Hilco later claimed that the charges were due under the terms of its Tariff for extensions of the distribution system made during the two years in dispute and that it had failed to adequately bill Double Diamond. Hilco demanded payment before it would construct any new electrical lines or facilities, but Double Diamond refused to pay. Thus, this dispute is about whether Hilco was entitled to be paid for construction work done between August 2, 1998, and August 23, 2000, according to the rates in the Tariff or whether some other agreement governed the amounts Double Diamond was obligated to pay.[3]

Double Diamond continued to refuse Hilco's demands and lodged a complaint with the Texas Public Utilities Commission, which took no corrective action against Hilco. In May 2001, Double Diamond sued Hilco in Travis County for injunctive relief to require Hilco to resume construction of additional electrical lines and facilities, for tortious interference, and for a declaratory judgment that it owed Hilco nothing in damages.[4] Hilco filed a counterclaim for $381,610.21.[5] In amended pleadings, which included sworn denials under Rules of Civil Procedure 93(10) and 185, Double Diamond asserted that: (a) by implication after August 1998, the terms of the 1996 written agreement had been extended or a new agreement entered into incorporating the same terms, and those terms controlled rather than those in the Tariff; (b) some of the back-charges Hilco was demanding were for services not rendered for or to Double Diamond; and (c) some of the back-charges were barred by limitations.

Hilco filed a motion for summary judgment based on theories of breach of contract, suit on a sworn account, and quantum meruit. It also requested that Double Diamond's suit for declaratory relief be denied. Double Diamond filed a motion for partial summary judgment claiming that any charges for services performed more than six months prior to September 1, 1999,[6] were barred by limitations. In May 2002, the trial court granted Hilco's

2. Lemons succeeded D.L. Knight, who succeeded Forman. Lemons testified in a deposition that he visited White Bluff after he joined Hilco, with a view toward purchasing property there. He said a casual conversation with a salesman caused him to investigate whether Double Diamond was being fully charged for work Hilco performed. He found out that Double Diamond and others were not being billed according to the rates set by the Tariff. He informed Hilco's Board of Directors and sent the letter to Double Diamond.

3. There is no dispute between the parties regarding charges for work done prior to August 1998.

4. The suit was transferred to Hill County under an agreement that Hilco would do future construction work and Double Diamond would pay for that work according to the Tariff and withdraw its request for injunctive relief.

5. The reduction in amount from the original claim is due to allowances to which Double Diamond was entitled.

6. On that date, by Legislative enactment, Hilco ceased to be regulated by the Texas Public Utilities Commission. *See generally Southwestern Elec. Power Co. v. Grant,* 73 S.W.3d 211, 215–17 (Tex.2002) (comment on the effect of the 1999 amendments); *Houston Lighting & Power v. Auchan USA,* 995 S.W.2d 668, 674–75 (Tex.1999) (effect of PUC-approved tariff of a regulated utility). Citing rule 25.28(d)(1), Double Diamond says the PUC regulations set a maximum of six-months for back-charges from the date the error was discovered. 16 Tex. Admin. Code § 25.28(d)(1).

motion for summary judgment in the amount of $439,456.28, which apparently included $75,000 in attorney's fees. The court denied Double Diamond's motion for partial summary judgment.[7]

## STANDARD OF REVIEW

"Rule 166a provides a method of summarily terminating a case when it clearly appears that only a question of law is involved and that there is no genuine fact issue." *Rhone–Poulenc, Inc. v. Steel,* 997 S.W.2d 217, 222 (Tex.1999). The movant has the burden to prove by summary-judgment evidence that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law on the issues expressly set out in the motion." *Id.; Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548 (Tex.1985); Tex.R. Civ. P. 166a(c).

We review a summary judgment *de novo. Rucker v. Bank One Texas, N.A.,* 36 S.W.3d 649, 653 (Tex.App.-Waco 2000, pet. denied). In conducting our review, we must accept as true all evidence that is favorable to Double Diamond and resolve all doubts and indulge every reasonable inference regarding the existence of a genuine issue of fact in favor of Double Diamond. *Rhone–Poulenc, Inc.,* 997 S.W.2d at 223; *Nixon,* 690 S.W.2d at 548–49.

## HILCO'S MOTION FOR SUMMARY JUDGMENT

■ Hilco's motion for summary judgment asserted there was no fact dispute on its claims of breach of contract, suit on a sworn account, and quantum meruit. The order granting summary judgment does not state under which theory it was granted. When the trial court does not specify the basis for the summary judgment, we

will affirm it if any of the movant's grounds has merit. *FM Properties Operating v. City of Austin,* 22 S.W.3d 868, 872–73 (Tex.2000); *Star–Telegram, Inc. v. Doe,* 915 S.W.2d 471, 473 (Tex.1995). Thus we will address all three grounds.

### *Breach of Contract*

Double Diamond asserts: (1) after August 1998, the parties' agreement for extensions of Hilco's distribution system was an implied agreement, the terms of which were identical to the August 1996 written agreement, and therefore the rates and charges which had applied the previous two years controlled, rather than those of the Tariff; and (2) if the Tariff controlled, the amounts demanded by Hilco are inaccurate, because not all the charges billed were for services to or for the benefit of Double Diamond. Finding it dispositive, we will address the first of these two contentions.

### *The Tariff:*

Under the terms of the Tariff, a person desiring to purchase electricity from Hilco must (1) file an "application for membership," (2) apply for service by signing Hilco's "Electric Service Agreement," and (3) provide Hilco with any easement necessary. The Electric Service Agreement incorporates the terms of the Tariff. The grant of the application operates as Hilco's acceptance of the Member's offer to purchase electric service. The Electric Service Agreement, which includes the terms of the Tariff, and the easement specify the terms of the "contract" between Hilco and the Member regarding electric service to the Member's residence or to a commercial

---

7. Issues about a Rule 11 agreement violation were severed, making the summary judgment final.

or industrial installation.[8] The tariff also provides for payment of the cost to extend distribution lines, which varies according to the status of the facility to be served: permanent single family residence, non-permanent residence, commercial or industrial installation, or subdivision development or mobile-home park. White Bluff is a subdivision development.

The Tariff provides: "Usually the extensions provided for developers of a subdivision are largely primary voltage facilities. Arrangements for extensions of secondary voltage facilities are handled with individual Members under the appropriate residential or commercial policy." The Tariff provides that the developer will pay the actual cost of construction, less $1,200, prior to the commencement of construction. Under the Tariff, Double Diamond is a "developer."

*Contract: Express or Implied?*

To establish that the Tariff controls, Hilco says that the Tariff itself is the contract. Alternatively, it points to the express language in the 1996 written agreement, affirmed in the extension agreement, that says "upon termination [of the agreement], [Hilco's] approved tariffs will be in effect." Third, Hilco refers us to section 304.4 of the Tariff which says the "contract for electric service may be modified or terminated by the agreement of both [Hilco] and the member if such agreement is made in writing and signed by both parties."

Double Diamond, to support its argument that fact issues exist about whether the parties had an implied agreement to continue under the terms and conditions of the 1996 written agreement, refers us to deposition testimony and affidavits from employees of both Double Diamond and Hilco. These witnesses state that the parties continued to deal with each other from August 1998 to August 2000, just as they had under the 1996 written agreement. Further, this summary judgment evidence shows that Hilco never charged Double Diamond under the Tariff for the extension of distribution lines and facilities during that period. Finally, Double Diamond argues that Lemons, in his August 2000 letter, said "effective immediately" the terms of the Tariff controlled, thereby implying that they had not previously controlled.

■ We do not agree with Hilco's primary contention that the Tariff, standing alone, is a contract. The Tariff is a unilateral, one-party document. Some agreement of another party is necessary to create a contract. That is usually the Electric Service Agreement. However, we believe that in the absence of any written agreement, an implied agreement would exist between Hilco and a person or entity to whom Hilco began furnishing electricity or other services under the Tariff.[9] By its express terms, Hilco's Tariff is only part of whatever agreement exists between Hilco and another party.

8. This provision of the Tariff is consistent with the generally accepted principle of contract interpretation that all writings that pertain to the same transaction will be considered together, even if they were executed at different times and do not expressly refer to one another. *DeWitt County Elec. Co-op., Inc. v. Parks*, 1 S.W.3d 96, 102 (Tex.1999).

9. We recognize that other courts have held: "Tariffs, thus, amount to a binding contract between the utility and its customers." *See, e.g., Grant v. Southwestern Elec. Power Co.*, 20 S.W.3d 764, 768 (Tex.App.-Texarkana 2000), *aff'd in part & rev'd in part*, 73 S.W.3d 211 (Tex.2002). However, since 1999, Hilco has not been regulated, and its own Tariff requires that the other party enter into some agreement with Hilco.

Hilco points to no express agreement in the record between itself and Double Diamond, other than the August 1996 agreement and the 1997 extension, that would impose the charges provided by the Tariff for extensions of the distribution system to serve White Bluff between August 1998 and August 2000.[10] Hilco does not contend that the terms of its Tariff cannot be modified.[11] Rather, its alternative contention is that termination language of the written 1996 agreement re-imposed the charges provided by the Tariff on all extensions of the distribution system requested by Double Diamond after August 2, 1998. In the absence of another agreement that might be true, but Double Diamond asserts an implied agreement containing contrary terms and conditions. Thus, we turn to a consideration of the legal authority for the existence of an implied agreement.

Double Diamond relies on *Emmer v. Phillips Petroleum Co.*, 668 S.W.2d 487 (Tex.App.-Amarillo 1984, no writ). There, the court observed that when a contract is implied in fact, the law finds a mutual intent to contract from the facts and circumstances of the case. *Id.* at 490 (citing *Haws & Garrett G. Con., Inc. v. Gorbett Bros. Weld. Co.*, 480 S.W.2d 607, 609 (Tex. 1972)). Whether that mutual intent exists, however, is a question of fact. *Id.* The court continued:

> The situation becomes more complex when parties initially operate under an express contract, but continue to operate in essentially the same manner after the express contract has expired. Although there is scant Texas law on the problem, other jurisdictions have held that, after expiration of the express contract, the

rights of the parties are to be determined under implied contract principles. Although their conduct may permit a finding that the parties have impliedly agreed that their rights should continue to be measured by the old contract, those rights arise from the new implied contract, not the old expired contract.

*Id.* Other courts imply an extension of the former contract. For example, *Sieber & Calicutt, Inc. v. La Gloria Oil & Gas Co.* involved a maintenance contract for services at a refinery owned by La Gloria. *Sieber & Calicutt, Inc. v. La Gloria Oil & Gas Co.*, 66 S.W.3d 340, 344 (Tex.App.-Tyler 2001, pet. denied). For more than a year after the contract expired by its own terms, Sieber continued to perform maintenance services at the refinery and sent La Gloria invoices for those services. *Id.* La Gloria continued to pay the invoices. *Id.* A La Gloria employee died at the refinery after the contract's expiration date, and a dispute arose about whether an indemnity agreement in the contract was still in effect. *Id.* at 347. The Tyler Court held that, because the parties continued to perform under the contract after it had expressly expired, the indemnity provision of the contract was in effect on the date of the employee's death. *Id.* The court said, "An extension of time for performance may be implied as well as express.... When the exact duration of an extension of time is not express, the law will imply a reasonable time.... The extension of a term of a contract is the extension of all of its provisions." *Id.* (citations omitted); *see also Triton Commercial Prop., Ltd. v. Norwest Bank Texas, N.A.*, 1 S.W.3d 814,

---

10. Double Diamond may well have such an agreement as a member of Hilco for the *use* of electricity at an office or other facility.

11. When state law creates a state agency and a statutory scheme under which the agency

determines reasonable rates for the service provided, the "filed-rate doctrine" prohibits modification of the terms of the tariff. *See, e.g., Grant*, 73 S.W.3d at 216–17.

818 (Tex.App.-Corpus Christi 1999, pet. denied) (extension of time for performance may be implied as well as express).

 We find no authority, and Hilco has directed us to none, prohibiting parties from impliedly extending an agreement or entering into a new agreement after a written agreement expires.

 Last, we reject Hilco's assertion that section 304.4 of the Tariff requires a written agreement to modify the Tariff. That section, by its plain terms, applies to agreements between Hilco and its members for "electric service." Furthermore, a written agreement not required by law to be in writing may be modified by a later oral agreement, even though it provides that it can be modified only in writing. *Mar-Lan Industries, Inc. v. Nelson,* 635 S.W.2d 853, 855 (Tex.App.-El Paso 1982, no writ); *Adams v. Can-Dee Oil Corp.,* 357 S.W.2d 808, 808 (Tex.Civ.App.-Waco 1962, writ ref'd n.r.e.).

 Having found authority for and no prohibition against the existence of an implied agreement between Hilco and Double Diamond, our next inquiry is whether there is summary judgment evidence to create a fact issue or issues about the existence of such an agreement.

 As we have noted, to prove the establishment of a contract, there must be evidence of a mutual agreement between the parties. *Haws & Garrett G. Con., Inc.,* 480 S.W.2d at 609. When that evidence consists of the conduct of the parties and their course of dealing with one another, then mutual agreement may be inferred from the circumstances, in which event the contract is said to be "implied" as opposed to being an "express" contract. *Id.* The existence of an implied contract, involving as it does an inference from circumstantial evidence, is a question of fact. *Id.* at 609–10.

Here, Double Diamond brought forward summary judgment evidence to show that the parties continued for two years after August 1998 to deal with each other exactly as they had under the 1996 written agreement. Summary judgment proof also shows that Hilco never indicated until August of 2000 that it intended to charge under the Tariff for the extension of its distribution system during the period in question. Finally, in his August 2000 letter, Lemons said "effective immediately" the procedures in the Tariff controlled, thereby implying that they had not previously controlled.

Based on this evidence and allowing Double Diamond the benefit of all doubts and reasonable inferences, we find that there is a genuine fact issue about whether the parties entered into an implied agreement after August 2, 1998, which continued the former rates and charges rather than those in the Tariff. Tex.R. Civ. P. 166a(c); *Rhone-Poulenc, Inc.,* 997 S.W.2d at 222. Therefore, the trial court erred in finding as a matter of law that Hilco was entitled to charge the Tariff rates for construction work done between August 2, 1998, and August 23, 2000.

*Statute of Frauds*

 Hilco's reply to Double Diamond's response to the motion for summary judgment raises one additional question we will address: whether such an implied agreement would violate the statute of frauds. An oral agreement which is not to be performed within one year is not enforceable. Tex. Bus. & Com.Code Ann. § 26.01(b)(6) (Vernon 2002). However, "[i]f a contract can, from the terms of the agreement, be performed within one year it is not within the Statute of Frauds." *Miller v. Riata Cadillac Co.,* 517 S.W.2d 773, 775 (Tex.1974). The summary-judgment record does not conclusively estab-

lish that the implied agreement could not have been performed within one year. If an oral indefinite-term employment contract is not prohibited by the statute of frauds, we fail to see why an oral indefinite-term contract to extend distribution lines should be. *See id.* Thus, we reject Hilco's statute-of-fraud assertions and proceed to its assertions that it is entitled to recover because it presented a sworn account or on its theory of quantum meruit.

### Suit on a Sworn Account

A suit on a sworn account is a suit in which the rules of civil procedure control evidentiary matters; specifically, proof of certain facts is presumed if the plaintiff's pleadings contain certain sworn assertions, as Hilco's do, and the defendant does not file a sworn denial of those assertions. TEX.R. CIV. P. 185; *Rizk v. Financial Guardian Ins. Agency, Inc.*, 584 S.W.2d 860, 862 (Tex.1979); *Worley v. Butler*, 809 S.W.2d 242, 244–45 (Tex.App.-Corpus Christi 1990, no writ) (elements of suit on sworn account). It is not a rule of substantive law. *Rizk*, 584 S.W.2d at 862. If the sworn denials are filed, as Double Diamond did, the evidentiary effect of the itemized account is destroyed, and the party must prove its claim. *Id.* Here, that claim sounds in contract law, an issue we have already addressed. *See Hou–Tex Printers, Inc. v. Marbach*, 862 S.W.2d 188, 190 (Tex.App.-Houston [14th Dist.] 1993, no writ) (defining and describing what qualifies as suit on sworn account). In the absence of a conclusive showing of the right to recover the Tariff amounts and in the face of the sworn denials, summary judgment on this basis would be improper.

### Quantum Meruit

Quantum meruit is an equitable remedy which applies when the plaintiff has performed services for and provid-

ed materials to the defendant, and the defendant has been unjustly enriched thereby. *Vortt Exploration v. Chevron U.S.A.*, 787 S.W.2d 942, 944 (Tex.1990); *Harker Heights, Tex. v. Sun Meadows Land*, 830 S.W.2d 313, 318 (Tex.App.-Austin 1992, no writ). If the delivery of services and materials, and payment for them, are governed by a valid contract, the action sounds in contract, not quantum meruit. *Id.; Truly v. Austin*, 744 S.W.2d 934, 936 (Tex.1988). The dispute between Hilco and Double Diamond is one concerning failure to pay under a contract, the terms of which are in dispute. Therefore, summary judgment on the basis of quantum meruit would be improper.

### Amount of Damages

Because we will reverse the summary judgment after finding a fact issue about the existence of an implied agreement, we do not address Double Diamond's argument attacking the amount of the damages awarded.

### DOUBLE DIAMOND'S MOTION FOR PARTIAL SUMMARY JUDGMENT

We will likewise not review Double Diamond's assertion that its motion for partial summary judgment should have been granted. Double Diamond's motion sought only a declaration regarding limitations as to part of the damages claimed by Hilco; it did not request a final disposition of all its claims. On appeal, we may not consider cross-motions for summary judgment that do not seek a final disposition of all claims in the trial court. *See Montgomery v. Blue Cross & Blue Shield*, 923 S.W.2d 147, 152 (Tex.App.-Austin 1996, writ denied) (en banc) (refusing to render judgment based on cross-motion for partial summary judgment because motion did not seek final disposition of claims in trial

court); *see also Runyan v. Mullins*, 864 S.W.2d 785, 790 (Tex.App.-Fort Worth 1993, writ denied).

## CONCLUSION

The trial court erred in granting Hilco's motion for summary judgment, because there is a disputed fact issue about what agreement was in effect. We reverse the judgment and remand the cause to the trial court for further proceedings.

Former Chief Justice DAVIS not participating.[12]