Affirmed and Opinion filed May 26, 2005









Affirmed
and Opinion filed May 26, 2005.

 

 

In The

 

Fourteenth Court of Appeals

_______________

 

NO. 14-03-01198-CV

_______________

 

XCO PRODUCTION COMPANY,
Appellant

 

V.

 

BRUCE L. JAMISON AND 

B.L. JAMISON FAMILY LIMITED PARTNERSHIP, Appellees

_________________________________________________________________

 

On Appeal from the 11th
District Court

Harris County, Texas

Trial Court Cause No. 99‑38725

_________________________________________________________________

 

O P I N I O N

Appellees, Bruce L. Jamison and B.L. Jamison Family Limited
Partnership (collectively AJamison@), sued appellant XCO Production Company (AXCO@) for breach of a contract governing
Jamison=s purchase of an interest in certain
oil and gas properties.  The parties
disagree over the interpretation of the contract.  After a jury returned its verdict
interpreting the contract in Jamison=s favor, the trial court entered
judgment for Jamison.








In three issues, XCO contends (1) the trial court erred in
submitting a jury question regarding interpretation of the contract because it
is unambiguous and in XCO=s favor as a matter of law, (2) Jamison=s claim is barred by the four-year
statute of limitations, and (3) Jamison=s claim is barred by a contractual
statute of limitations.  We agree that
the contract is unambiguous as a matter of law, but in Jamison=s favor.  Therefore, we conclude any error in
submitting the jury question was harmless because the jury, nonetheless,
decided the issue in Jamison=s favor.  We further
conclude that XCO failed to prove that Jamison=s breach of contract claim was barred
by the four-year statute of limitations or a contractual statute of
limitations.  Accordingly, we affirm.

I.  Background

XCO is an oil and gas exploration company.  Robert Gray is vice-president and 100% owner
of XCO.  In 1991, XCO owned working
interests in oil and gas properties in Louisiana.[1]  At that time, Jamison, who was interested in
a low-risk investment opportunity that would provide tax advantages and future
income, was introduced to Gray by one of Jamison=s friends. 

Jamison and XCO entered into a written AMemorandum of Agreement,@ effective December 13, 1991, whereby
Jamison would purchase a portion of XCO=s working interest in several Louisiana
properties.  The agreement created a Atax partnership@ between Jamison and XCO.[2]  Under the agreement, Jamison made a $500,000
capital contribution to the partnership, and XCO contributed its working
interest in the properties.  The disputed
portion of the agreement, paragraph 9, concerns allocation of income and costs
among XCO and Jamison as follows:








9.  Partnership
Allocations.  Each item of income, gain, loss or deduction
shall be allocated between XCO and JAMISON as follows:

(a)       First, all [intangible drilling costs] and general and
administrative costs paid from December 13, 1991 through December 31, 1992,
shall be allocated to JAMISON, provided, however, that no such amounts shall be
allocated to Jamison which would cause his fair market value capital account to
become negative or increase its negative position; 

(b)       Second, all depreciation with respect to tangibles held by the
Tax Partnership or with respect to the Weldon Operating Agreement and allocable
to the XCO-JAMISON partnership shall be allocated to JAMISON, provided,
however, that such allocations, in the aggregate, shall not cause his fair
market value capital account to become negative or increase its negative
position;

(c)       All costs other than those set forth in paragraphs 9.a and 9.b
of this Memorandum of Agreement shall be allocated to XCO;

(d)       30% of the XCO-JAMISON Partnership=s net revenues, after adjustment for the items of cost
set forth in paragraphs 9.a, b and c of this Memorandum of Agreement, shall be
allocated to JAMISON until such time as he has received $500,000.00 in
distributions from the XCO-JAMISON Partnership (APayout@); the balance of the net revenues shall be allocated
to XCO during such period.

(e)       After Payout, Jamison shall receive 1.25% of the net profits
of the XCO-Jamison Partnership; the balance of the XCO-JAMISON Partnership=s revenues, and all of its expenses, shall be
allocated after Payout to XCO.

The parties urge different interpretations of paragraph 9,
and we will later discuss their interpretations in more detail.  In short, however, XCO claims paragraph 9
allowed XCO to deduct all costs, including lease operating expenses,
intangible drilling costs, general and administrative costs, and depreciation,
from net revenues to determine Jamison=s payout (30% of net revenues).  In contrast, Jamison claims XCO could
allocate to him only the costs listed in subparagraphs (a) and (b) (intangible
drilling costs, general and administrative costs, and depreciation); and once
$500,000 in costs were allocated to him, he was entitled to 30% of net
revenues, without regard to costs, until he recouped his initial $500,000
investment.








In any
event, beginning in 1992, XCO issued accounting statements reflecting that it
apparently deducted all costs from net revenues according to its interpretation
of the agreement.[3]  Meanwhile, in mid-1992, an unrelated lawsuit
involving the properties was filed against XCO in Louisiana.  The Louisiana court ordered that all XCO=s revenues be paid into the registry
of the Louisiana court.  The revenues
were not released until early 1996.  At
that time, XCO told Jamison he would receive no money because costs had greatly
exceeded revenues.

In 1999,
Jamison sued XCO for breach of contract alleging that XCO failed to pay monies
due and improperly charged costs to him. 
Jamison also alleged the agreement was ambiguous.  After hearing the evidence, the trial court
determined that the agreement was ambiguous and submitted a jury question
regarding its meaning.  Specifically, the
jury was asked, ADid [XCO] and [Jamison] agree that [Jamison] would be paid
30% of net revenues after Jamison=s $500,000 investment was expended
only on costs allocated to Jamison in Paragraph 9(a) and 9(b) of the parties= Memorandum of Agreement?@ 
The jury answered Ayes,@ thus interpreting the agreement in Jamison=s favor.  The trial court entered judgment awarding
Jamison $417,173 plus $111,500 in attorneys= fees and interest.

II. 
Interpretation of the Memorandum of Agreement

In its
first issue, XCO contends the trial court erred in submitting the jury question
regarding interpretation of the agreement because the contract is unambiguous
in XCO=s favor as a matter of law.[4]








A.        Construction
of Contracts

Whether
a contract is ambiguous is a question of law to be decided by examining the
contract as a whole in light of the circumstances present when the contract was
made.  Universal Health Servs., Inc.
v. Renaissance Women=s Group, P.A., 121 S.W.3d 742, 746 (Tex. 2003); Columbia Gas
Transmission Corp. v. New Ulm Gas, Ltd., 940 S.W.2d 587, 589 (Tex.
1996).  A contract is not ambiguous if it
can be given a certain or definite meaning as a matter of law.  Universal Health Servs., 121 S.W.3d at
746; Columbia Gas Transmission Corp., 940 S.W.2d at 589.  Lack of clarity does not create an
ambiguity.  Universal Health Servs.,
121 S.W.3d at 746; Forbau v. Aetna Life Ins. Co., 876 S.W.2d 132, 134
(Tex. 1994).  Further, a contract is not
ambiguous simply because the parties advance conflicting interpretations.  Columbia Gas Transmission Corp., 940
S.W.2d at 589; Forbau, 876 S.W.2d at 134.  Rather, a contract is ambiguous if it is
subject to two or more reasonable interpretations after one applies the
pertinent rules of construction.  Universal
Health Servs., 121 S.W.3d at 746; Columbia Gas Transmission Corp.,
940 S.W.2d at 589.  If a contract is
ambiguous, a fact issue exists on the parties= intent.  Columbia Gas Transmission Corp., 940
S.W.2d at 589.

Accordingly,
to determine whether the agreement is ambiguous, we must decide whether both
parties= interpretations are reasonable.  After examining the agreement and the
circumstances present when it was made, we conclude that XCO=s construction is not
reasonable, but Jamison=s interpretation is reasonable.  

B.        XCO=s
Interpretation








In
support of its argument that only its interpretation is reasonable, XCO points
to subparagraph 9(d) which provides, A30% of the XCO-JAMISON Partnership=s net revenues, after adjustment
for the items of cost set forth in paragraphs 9.a, b and c . . . shall be
allocated to JAMISON . . . .@ (emphasis added). 
According to XCO, Aafter adjustment@ means Asubtract@; thus, all costs, including
the costs set forth in subparagraphs (a), (b), and (c), are to be subtracted
from net revenues before determining Jamison=s 30% payout.[5]

XCO
states that, because Jamison purchased a Aworking interest@ in the properties and Aworking interest@ is a cost-bearing interest, all
costs had to be deducted from net revenues for Jamison=s interest to be a Aworking interest.@ 
Further, the court-appointed auditor who examined the agreement in
connection with this suit opined in his report that all costs were to be
deducted from net revenues to determine Jamison=s payout.  XCO=s interpretation of subparagraph (d),
however, creates several conflicts with the rest of paragraph 9.  See J.M. Davidson, Inc. v. Webster, 128
S.W.3d 223, 229 (Tex. 2003) (stating that in construing contracts, no single
provision taken alone will be given controlling effect; rather, the court must
consider the entire contract to harmonize and give effect to all its
provisions, so that none will be rendered meaningless).

First,
under XCO=s interpretation, subparagraph (d)
conflicts with subparagraphs (a) and (b). 
Subparagraphs (a) and (b) state that certain costs are to be allocated
to Jamison=s capital account.  However, according to XCO, under subparagraph
(d), these same costs are to be subtracted from net revenues to determine
Jamison=s payout.  Therefore, XCO=s interpretation creates a conflict
as to how the costs are to be treated.

Further,
under XCO=s interpretation, subparagraph (d)
conflicts with subparagraph (c). 
Subparagraph (c) provides that all costs other than intangible
drilling costs, general and administrative costs, and depreciation are to be allocated
to XCO.  But, subtracting these Aother@ costs from net revenues to calculate
Jamison=s payout, as urged by XCO, would
effectively allocate these costs to Jamison in contravention of subparagraph
(c).








In
addition, under XCO=s interpretation, there is no limit on the amount of costs
that may be deducted from net revenues to determine Jamison=s payout.  That reasoning, however, conflicts with
subparagraphs (a) and (b) which provide that Ano such amounts shall be allocated to
Jamison that would cause his fair market value capital account to become
negative or increase its negative position.@ 
Allocating all costs, regardless of amount, to Jamison could cause his
capital account ($500,000) to become negative.

Finally,
XCO=s interpretation does not reconcile
the use of the term Anet revenues@ in subparagraph (d) with the use of the term Anet profits@ in subparagraph (e).  According to XCO, under subparagraph (d), all
costs are to be subtracted from Anet revenues@ to determine Jamison=s payout.  However, under subparagraph (e), after
Jamison=s payout reaches $500,000, he then
receives 1.25% of Anet profits.@  If Anet revenues@ includes all costs as urged by XCO,
then the use of the term Anet profits@ in subparagraph (e) is rendered meaningless.  XCO=s interpretation fails to explain how
Jamison=s interest converts from a Anet revenues@ interest to a Anet profits@ interest if all costs are already
being deducted from Anet revenues.@

Consequently,
because XCO=s interpretation creates several
internal conflicts in paragraph 9, we cannot conclude that XCO=s interpretation is reasonable.  

C.        Jamison=s
Interpretation








To
substantiate his interpretation of paragraph 9, Jamison relies on the testimony
of Shelly Cashion, his tax lawyer who drafted the agreement.[6]  Cashion testified the agreement was an Aodd duck@ because it included accounting
methodology unique to tax partnerships. 
According to Cashion, in oil and gas taxation, Aallocate,@ Aadjust,@ Anet revenues,@ and Anet profits@ are terms of art.  Cashion defined these terms as follows:

            AAllocate@:                 means to divide tax items among
partners. 

AAdjust@:                     is the consequence of that Aallocation.@ AAdjust@ does not mean Asubtract@ or Adeduct.@  Rather, tax items are Aallocated@ to a
partner, and the partner=s capital account is Aadjusted@ to account for that Aallocation.@

ANet revenues@:         means the cash from oil and gas
production minus severance taxes and royalties only.  

ANet profits@: means Anet
revenues@ minus Alease
operating expenses,@ which are the operating costs of the business.

 

Applying these
definitions to paragraph 9, Cashion explained that pursuant to subparagraphs
(a) and (b), intangible drilling costs, general and administrative expenses,
and depreciation are allocated to Jamison=s capital account until his capital
account reaches zero.  In other words,
Jamison would receive a total allocation of no more that $500,000 in intangible
drilling costs, general and administrative expenses, and depreciation.  Pursuant to subparagraph (c), all other costs
are allocated to XCO=s capital account.








Next,
Cashion explained the operation of the disputed subparagraph (d).  She testified that the phrase Aafter adjustment for the items of
cost set forth in paragraphs 9.a, b and c@ does not mean subtract all the costs
outlined in subparagraphs (a), (b), and (c) from net revenues to determine
Jamison=s payout.  Rather, the phrase is a Atiming mechanism.@ 
After these costs are allocated to the respective capital accounts pursuant
to subparagraphs (a), (b), and (c) and Jamison=s capital account reaches zero,
Jamison receives 30% of net revenues until he has recouped his $500,000 capital
contribution.  Thus, Jamison does not
receive a percentage of net revenues until his capital account is Achewed up.@ 
Further, because the term Anet revenues@ is used, Jamison receives 30% of net
revenues without regard to costs, including lease operating expenses.  In sum, Awe spent all his money and now we are
going to give it back to him -- until he gets in cash $500,000.@

Cashion
then stated that pursuant to subparagraph e., once Jamison has recouped his
$500,000, his interest converts to receiving 1.25% of Anet profits,@ which means he is now charged with all
costs, including lease operating expenses.

We
conclude that Cashion=s explanation of paragraph 9 is reasonable because her
definitions of Aallocate@ and Aadjustment@ resolve any conflicts between the subparagraphs.  Further, Cashion=s distinction between Anet revenues@ and Anet profits@ clarifies the use of Anet revenues@ in subparagraph (d), but not Anet profits@ in subparagraph (e).[7]








Moreover,
Jamison=s interpretation is consistent with
the circumstances present when the contract was made. It is undisputed that
Jamison made known to Gray from the outset that he wanted a low-risk investment
with maximum tax advantages and an opportunity to get his capital back.  In return, Jamison was willing to receive a
small percentage in the long-run.  If the
parties had agreed that revenues could be reduced by all potential costs before
calculating Jamison=s payout, as urged by XCO, Jamison=s investment would not have been
low-risk.  Further, Cashion confirmed
that the parties= objective was to allocate certain deductions to Jamison and
then pay back his investment from revenues.

The most
significant evidence of the circumstances present when the contract was made is
a letter from Gray to Jamison outlining XCO=s proposal.  Gray stated that XCO anticipated incurring a
certain amount of general and administrative costs and intangible drilling
costs in a short time period with respect to the properties.  Gray proposed that Jamison Areimburse@ XCO for these costs.  Gray also proposed that Jamison 

Awould receive a defined percentage of XCO=s monthly production revenues on a preferential
basis computed without regard to expense. 
After [Jamison] had recouped the value of his investment, his interest
in the partnership would convert to a >net
profits interest= such that he would receive a significantly reduced
percentage of the net profits attributable to the partnership.@  

 

(Emphasis added).[8]  This proposal is consistent with Jamison=s argument that only certain costs
were to be allocated to him; then, he would recoup his investment out of net
revenues without regard to costs before his interest converted to a net profits
interest.[9]

Nevertheless,
Gray testified that the portion of his proposal offering to return Jamison=s investment Aon a preferential basis computed
without regard to expense@ was not embodied in the final agreement.  According to Gray, Cashion and XCO=s tax lawyer advised him that his
proposal could not be utilized because it created, in effect, a cost-less
interest that would not allow Jamison any tax deductions.








At
trial, however, Cashion clarified her concerns with the initial proposal.  She explained that Gray=s proposal would result in Jamison=s immediately recouping his
investment out of net revenues.  Cashion
feared the IRS might view such an arrangement as a loan, rather than an
investment, and thus disallow any deductions. 
Therefore, she and XCO=s tax attorney decided to draft the agreement so as to
postpone Jamison=s participation in net revenues until his investment had been
Achewed up@ through allocation of the costs
outlined in subparagraphs (a) and (b).[10]  Therefore, Gray=s proposal that Jamison recoup his
investment on a Aon a preferential basis computed without regard to expense@ was embodied in the final
agreement.  However, Cashion=s tax concerns were alleviated by
modifying the timing for Jamison to recoup his investment.[11]

In sum,
although the agreement is not a model of clarity, we conclude that Jamison=s interpretation is reasonable
because it reconciles the subparagraphs of paragraph 9 and is consistent with
the circumstances present when the agreement was made.  Because the agreement is subject to only one
reasonable interpretation, it is unambiguous as a matter of law.  See Universal Health Servs., Inc.,
121 S.W.3d at 746; Columbia Gas Transmission Corp., 940 S.W.2d at
589.  Therefore, the trial court erred in
submitting a jury question regarding interpretation of the agreement.  See Transcon. Gas Pipeline Corp. v.
Texaco, Inc., 35 S.W.3d 658, 665 (Tex. App.CHouston [1st Dist.] 2000, pet.
denied) (stating that a trial court errs when it does not construe an
unambiguous provision as a matter of law, and instead, submits the issue to a
fact finder).  However, the error was
harmless because the jury, nonetheless, interpreted the agreement in Jamison=s favor.  See Tex.
R. App. P. 44.1(a)(1). 
Accordingly, we overrule XCO=s first issue.








III. 
Four-Year Statute of Limitations

In its second
issue, XCO contends that Jamison=s breach of contract claim was barred
by the four-year statute of limitations.  See Tex.
Civ. Prac. & Rem. Code Ann. ' 16.004 (Vernon 2002).  XCO asserts that Jamison=s claim accrued more than four years
before he filed suit as a matter of law. 
XCO also asserts that the trial court erred by submitting a jury
question on the discovery rule.[12]  We conclude the trial court erred by
submitting a jury question on the discovery rule; however, we hold the error
was harmless because XCO did not prove as a matter of law that Jamison=s claim accrued more than four years
before he filed suit.

A.        Jury Question On The Discovery Rule.

A
defendant challenging an adverse finding on limitations must conclusively
establish the applicability of the statute of limitations, including the date
on which limitations commenced.  See
Provident Life & Acc. Ins. Co. v. Knott, 128 S.W.3d 211, 220 (Tex.
2003); Intermedics, Inc. v. Grady, 683 S.W.2d 842, 845 (Tex. App.CHouston [1st Dist.] 1984, writ ref=d n.r.e.); see also Willis v.
Donnelly, 118 S.W.3d 10, 28 (Tex. App.CHouston [14 Dist.] 2003, pet. filed)
(citing Woods v. William M. Mercer, Inc., 769 S.W.2d 515, 517 (Tex.
1988)).  Generally, when a cause of
action accrues is a question of law.  Knott,
128 S.W.3d at 221 (citing Moreno v. Sterling Drug, Inc., 787 S.W.2d 348,
351 (Tex. 1990)). 








As a
general rule, a cause of action accrues and the statute of limitations begins
to run when facts come into existence that authorize a party to seek a judicial
remedy.  Id. at 221 (citing Johnson
& Higgins of Tex., Inc. v. Kenneco Energy, Inc., 962 S.W.2d 507, 514
(Tex. 1998)).  In most cases, a cause of
action accrues when a wrongful act causes some legal injury, even if the fact
of injury is not discovered until later, and even if all resulting damages have
not yet occurred.  Id. (citing S.V.
v. R.V., 933 S.W.2d 1, 4 (Tex. 1996)). 
A breach of contract cause of action accrues when the contract is
breached.  Willis, 118 S.W.3d at
28 (citing Stine v. Stewart, 80 S.W.3d 586, 592 (Tex. 2002)).

When
applicable, however, the discovery rule exception to the statute of limitations
defers accrual of a cause of action until the plaintiff knows, or by exercising
reasonable diligence should know, of the facts giving rise to the claim.  Wagner & Brown, Ltd. v. Horwood,
58 S.W.3d 732, 734 (Tex. 2001).  The
discovery rule is Aa very limited exception to statutes of limitations@ and applies only when the nature of
the plaintiff=s injury is both Ainherently undiscoverable@ and Aobjectively verifiable.@ 
Id.

XCO
contends that the discovery rule was inapplicable here because Jamison=s injury was not Ainherently undiscoverable.@ 
We agree.  An injury is inherently
undiscoverable if it is, by its nature, unlikely to be discovered within the
prescribed limitations period despite due diligence.  Id. at 734B35. 
Whether an injury is inherently undiscoverable is determined on a
categorical basis because such an approach Abrings predictability and consistency
to the jurisprudence.@  Id. at 735.









Thus,
the question here is whether Jamison=s injury is Athe type of injury that generally is
discoverable by the exercise of reasonable diligence.@ 
See id.  In Wagner &
Brown, the court held that some royalty owners= claim against a gas lessee for
improper charges resulting in underpayment of royalties was not inherently
undiscoverable.  Id. at 737.
Although information regarding the charges was unavailable from public sources
and the gas lessees misrepresented the charges, there were several sources of
information from which royalty owners could discover whether charges were
reasonable.  Id. at 735B37. 
Similarly, under the facts of this case, a claim by a working interest
partner against the other partner for improperly charging expenses and failing
to pay net revenues cannot be inherently undiscoverable, particularly when the
claimant receives extensive information regarding the charges and
revenues.  Although we have determined
that the discovery rule is not applicable, however, submission of the jury
question was harmless.  The discovery
rule merely defers accrual of a cause of action until the plaintiff knows, or
should know, of facts giving rise to the cause of action.  See id. at 734.  Here, XCO did not conclusively prove that the
claim accrued more than four years before Jamison filed suit.[13]

B.        Accrual
Of The Cause of Action

XCO
contends that Jamison=s claim accrued as a matter of law more than four years
before Jamison filed suit on July 30, 1999. 
XCO contends that the breach, if any, of the agreement occurred as early
as February 1993, based on accounting statements that XCO sent to Jamison. 

The
February 1993 accounting statement indicates that a Aworkover@ expense of $869,700 for the St.
Charles Church well was charged against gross revenues before calculating XCO=s net revenues, and hence, Jamison=s share of net revenues.  The result of this improper charge is Anegative@ net revenues, and, thus, no share of
net revenues to be paid to Jamison for that month.[14]








Jamison=s damages expert testified that his
$500,000 investment had been Achewed up@ by late 1992. 
Therefore, under Jamison=s interpretation of the agreement, he should have started to
receive his payoutC30% of net revenues, without regard to expensesCby February 1993.[15]  Thus, the February 1993 statement shows XCO
proceeded contrary to the agreement because (1) XCO charged Jamison with more
than $500,000 in expenses, and (2) XCO subtracted expenses from net revenues to
calculate Jamison=s share of net revenues even after his $500,000 investment
was Achewed up.@

Jamison,
however, argues that despite the February 1993 statement, XCO=s breach did not occur at that time
for several reasons.  Specifically,
Jamison argues that (1) XCO did not refuse to pay Jamison=s share of net revenues in February
1993 because the revenues were frozen, (2) the time for performance was
extended by XCO=s reassurances while the revenues were frozen, and (3) XCO=s accounting statements contained
errors.

1.         Refusal to
Pay Jamison=s Share of Net Revenues 

First,
Jamison argues that the breach did not occur in February 1993 because XCO=s revenues had been frozen by order
of the Louisiana court.  Jamison contends
that XCO could not have refused to pay Jamison=s share of net revenues when it did
not even have access to the revenues. 

The
February 1993 statement does show that XCO improperly charged expenses against
net revenues.  In his petition, Jamison
pleads that XCO breached the agreement by, among other actions, A[c]harging expenditures improperly to
the account of [Jamison].@ However, Jamison also pleads that XCO breached the agreement
by A[f]ailing to pay monies when due.@ 
Therefore, he does not complain only of the improper charging of
expenses.  Rather, the gist of his
complaint is that he did not receive his $500,000 payout due to the improper
charging of expenses.  Thus, while the
February 1993 statement may show that XCO improperly charged expenses against
net revenues, the improper charging of expenses did not cause a legal injury at
that time because XCO did not have access to the revenues, and, thus, did not
refuse to pay Jamison his share.

2.         XCO=s Reassurances








In a
related argument, Jamison contends that his claim did not accrue in 1993
because the date for performance was expressly or impliedly extended by
agreement.  According to Jamison, while
the revenues were frozen, XCO reassured Jamison that he would receive his
payout when the revenues were released. 
Specifically, Jamison testified that while the revenues were frozen, he
asked Gray periodically about the status of the Louisiana suit.  Gray responded that the suit was going well
and Adon=t worry your money is in there.  Once we wrap this up, you=re going to get your money.  You are due your money, your net revenue.@ 
Jamison also testified that during 1992, he addressed with Gray whether
his $500,000 investment was being properly allocated.  Gray responded that XCO=s accounting was a Amess,@ and Awe really don=t know whether it is expended or not
expended or whatever, but it doesn=t matter because you=re . . . going to get paid on this
anyway because you=re going to get your $500,000.@ 
Significantly, XCO does not cite any evidence disputing these
reassurances.  Further, Jamison testified
that when the revenues were released in early 1996, XCO informed him for the
first time that he would not receive any share of net revenues because expenses
exceeded revenues.

Jamison
cites Willis, in which an employer agreed, among other matters, to
transfer stock to an employee when the employer=s revenues reached a certain
amount.  118 S.W.3d at 23.  The employee did not receive any of the stock
although over the years, revenues exceeded the amount specified in the
contract.  Id. at 24B25. 
After the employee was terminated without receiving the stock, he sued
the employer for breach of contract.  Id.
at 25.  The employer argued that the
claim was barred by limitations because the contract was breached on the date
the employer was first required to transfer the stock, which was more than four
years before suit was filed.  Id.
at 28.  We disagreed.  Id.








We recognized
that even when an exact date of performance is specified in a contract, this
provision can be waived by the parties.  Id.
(citing Sieber & Calicutt, Inc. v. La Gloria Oil & Gas Co., 66
S.W.3d 340, 347 (Tex. App.CTyler 2001, pet. denied); Intermedics, Inc., 683
S.W.2d at 846; Pickett v. Keene, 47 S.W.3d 67, 77 (Tex. App.CCorpus Christi 2001, pet. dism=d)). 
Further, an extension of time to perform can be express or implied and
does not affect the other provisions of the contract.  Id. (citing Intermedics, 683
S.W.2d at 846).  The evidence indicated
that the employer intended to honor the agreement Aat some point.@ 
Id.  The undisputed evidence
showed that each time the employee inquired about the stock ownership, the
employer assured him that the employer would comply with the agreement but
asked to delay the transfer until his financial condition improved.  Id. at 24B25, 28.  The employee relied on the employer=s assurances and accepted the
delays.  Id. at 28.  Thus, there was no clear intent by the
employer to repudiate the contract until the employee=s termination.  Id. 
Consequently, the employee=s cause of action accrued at that
time.  See id.

Similarly,
here, despite the February 1993 statement, as well as other statements,
indicating XCO was improperly charging expenses against net revenues, XCO
reassured Jamison that he would receive his payout when the revenues were
released.  Jamison relied on those
assurances and accepted the delay.  XCO
then repudiated the agreement when the revenues were released in early 1996 and
XCO first informed Jamison he would not receive his payout.  Therefore, based on XCO=s reassurances, the evidence does not
conclusively establish that the breach occurred in February 1993. 

3.         Accounting
Errors

Finally,
Jamison asserts that the breach did not occur in February 1993 because XCO=s accounting statements issued while
its revenues were frozen undisputedly contained errors.  Although XCO admitted that it had accounting
difficulties while the revenues were frozen, the nature of the accounting
errors is not clear.  Gray testified that
XCO did not receive statements from the registry of the Louisiana court.  Therefore, reconciling XCO=s records with the registry of the
court was difficult, and Awe just had to guess.@








Gray=s testimony indicates that XCO=s accounting difficulties concerned
the amount of its revenues.  If the
errors concerned only the amount of XCO=s revenues, the February 1993
statement, nonetheless, reflects that XCO calculated Jamison=s payout contrary to the
agreement.  Specifically, the statement
reflects that XCO deducted expenses from net revenues to calculate Jamison=s payout, regardless of the amount of
revenues.

In any
event, because the nature of the errors is not clear, we cannot conclude that
limitations bars Jamison=s suit based on statements that admittedly contained errors.  Further, regardless of the nature of the
errors, XCO assured Jamison that the errors would be corrected, and he would
receive his payout when the revenues were released.

Consequently,
XCO did not establish as a matter of law that Jamison=s cause of action accrued no later
than February 1993.[16]  Therefore, we hold Jamison=s cause of action is not barred by
the statute of limitations.  Accordingly,
XCO=s second issue is overruled.

IV. 
Contractual Statute of Limitations

In its
third issue, XCO contends that Jamison=s breach of contract claim was also
barred by a statute of limitations clause. 
Specifically, the Memorandum of Agreement incorporates the operating
agreements for the oil and gas properties. 
The operating agreements contain the following provision under the
section entitled AAccounting Procedures@:








[A]ll bills
and statements rendered to Non-Operators by Operator during any calendar year
shall conclusively be presumed to be true and correct after twenty-four (24)
months following the end of any such calendar year, unless within the said
twenty-four month period a Non-Operator takes written exception thereto and
makes claim on Operator for adjustment.

 

According to XCO, this
provision imposed a two-year statute of limitations for Jamison to contest any
costs deducted from net revenues during a given year.  We disagree. 


This
provision clearly applies to accounting procedures between the operator and the
non-operators.  Southhampton Mineral
Corporation was the operator for these properties; XCO and other entities were
the non-operators.  Jamison purchased a
portion of XCO=s non-operator interest in the
properties under a separate agreement, and his dispute is with XCO over the
terms of that agreement.  Jamison=s dispute is not with
Southhampton.  In short, this dispute is
not between the operator and a non-operator. 
Rather, this dispute is between two partners who constitute a
non-operator.  Therefore, this provision
did not impose a two-year contractual statute of limitations on Jamison with
respect to his breach of contract claim against XCO.[17]

Accordingly,
we overrule XCO=s third issue.








V. 
Conclusion 

We
conclude the contract is unambiguous as a matter of law, but in Jamison=s favor.  Therefore, any error in submitting the
complained-of jury question was harmless because the jury, nonetheless,
interpreted the agreement in Jamison=s favor.  We further conclude that XCO failed to prove
that Jamison=s breach of contract claim was barred
by the four-year statute of limitations or a contractual statute of
limitations.

Accordingly,
we affirm the judgment of the trial court.

 

/s/        Eva M.
Guzman

Justice

 

Judgment rendered and Opinion filed
May 26, 2005.

Panel consists of Chief Justice
Hedges and Justices Edelman and Guzman.

 

 











[1]  Southampton
Mineral Corporation was the operator for these properties.  





[2]  XCO and
Jamison were considered partners for federal income taxation purposes
only.  They were not considered partners
with respect to liabilities and obligations under state law.  Jamison=s tax
attorney testified the federal government permits this type of arrangement to
stimulate oil and gas investment.





[3]  As we will
later discuss, there is evidence that these statements contained errors.





[4]  In its brief,
XCO frames its first issue in several different ways.  However, the gist of its complaint is that
the trial court erred in submitting the jury question because the agreement is
unambiguous as a matter of law.  XCO does
not challenge the sufficiency of the evidence supporting the jury=s finding.





[5]  According to
XCO, these costs include all lease operating expenses, in addition to
intangible drilling costs, general and administrative costs, and
depreciation.  Apparently, the lease
operating expenses  are at the center of
this dispute.  There is evidence that
lease operating expenses are the primary type of other costs addressed in
subparagraph (c).  Further, XCO deducted
large amounts of lease operating expenses from net revenues pursuant to its
interpretation of the agreement. 





[6]  XCO contends
that Cashion=s testimony, as well as all evidence regarding the
parties= intent, is inadmissible parol evidence.  Extrinsic evidence is not admissible to
create an ambiguity or vary the terms of an unambiguous agreement; however,
when determining whether an agreement is ambiguous, we may examine extrinsic
evidence to interpret the terms used by the parties and extrinsic evidence of
the circumstances surrounding execution of the agreement.  See Belandran v. Safeco Inc. Co. of Am.,
972 S.W.2d 738, 741 (Tex. 1998); Nat=l
Union Fire Ins. Co. of Pittsburgh,
Pa. v. CBI Indus., Inc., 907 S.W.2d 517, 521 (Tex. 1995); Sun Oil Co.
(Del.) v. Madelay, 626 S.W.2d 726, 731 (Tex. 1981).  We note that Jamison also offered the
testimony of its expert who reviewed the agreement in connection with this
suit.  In addition, XCO offered the
report of the court-appointed auditor, who agreed with XCO=s interpretation. 
However, Cashion was the only expert actually involved in drafting the
agreement who testified regarding its meaning and the circumstances present
when it was drafted.





[7]  XCO has not
offered any contrary definition for the terms used in the agreement that would
make its interpretation reasonable.  In
his report, the court-appointed auditor stated that a Anet revenues@
interest is substantially the same as a Anet
profits@ interest for purposes of this agreement.  However, if that were the case, there is
still no explanation for using the two different terms in subparagraphs (d) and
(e).  Further, the auditor stated that
his audit was based on Council of Petroleum Accounting Societies (COPAS)
principles.  Jamison=s expert testified that COPAS explicitly defines Anet revenues@ as
gross proceeds less royalties and severance taxes; and COPAS explicitly defines
Anet profits@ as
gross proceeds less royalties, severance taxes, and operating
expenses.  In fact, later in his report,
the auditor seemed to acknowledge that the terms are not the same.  In particular, the auditor later summarizes
the partnership=s revenues, costs, and Jamison=s interest.  The
auditor has two separate categories entitled: ANet
Revenues allocated to Jamison (per paragraph 9d of the Agreement)@ and ANet Profit Interest (per paragraph 9e of the
Agreement).@  With respect
to the latter category, the auditor notes, A[i]s not
applicable until such time that the Net Revenue distribution reaches $500,000.@





[8]  Gray attached
a pro forma projecting production from the properties on a monthly basis and
Jamison=s corresponding potential return on his
investment.  Gray proposed two
alternativesCJamison=s
contributing $500,000 or contributing $1 million.  The pro forma shows Jamison=s potential return under both scenarios.  Under both scenarios, Jamison=s return is 30% of net revenues without regard to
expenses.





[9]  Craig Crawford,
Jamison=s friend who introduced him to Gray, testified that
Gray outlined a general proposal during their initial meetings.  Gray represented that Jamison would be given Apreferential treatment@ on the Afront end@ until
he recouped $500,000; Jamison would then receive a smaller residual interest on
the Atail end.@  Thus, this oral proposal is consistent with
Gray=s written proposal and Jamison=s interpretation of the eventual agreement.





[10]  XCO=s tax attorney did not testify, and, thus, did not
controvert Cashion=s explanation.





[11]  Cashion also
testified regarding two other changes between the proposal and final agreement,
as well as a subsequent amendment to the final agreement.  However, these changes and amendment are not
pertinent to this dispute. 





[12]  The jury answered
Ano@ to the following question: ABefore July 30, 1995, did [Jamison] discover, or in
the exercise of reasonable diligence should he have discovered, facts causing
him to believe that he had a claim for breach of the Memorandum of Agreement .
. . if any?@





[13]  Although
Jamison argues that the discovery rule applies, he also argues that application
of the discovery rule was not even necessary because the claim accrued less
than four years before he filed suit.





[14]  As XCO notes,
the March 1993 statement reflects that the Aworkover@ expense was carried forward and resulted in Anegative@ net
revenues for March as well.  In fact,
although XCO specifically cites the February 1993 statement, other accounting
statements show that expenses were deducted from net revenues before
calculating XCO=s net revenues, and hence, Jamison=s share of net revenues.  However, deducting the expenses did not
always result in Anegative@ net
revenues as it did in February 1993.





[15]  Further,
according to Jamison=s expert, he should have received the full payout by
April 1994 (more than four years before he filed suit).





[16]  XCO cites only
the February 1993 statement to support its statute of limitations defense in
its original briefing.  However, XCO also
cites the 1992 accounting statements in its post-submission brief.  In particular, XCO argues that the April 1992
statement shows XCO did not allocate expenses and calculate net revenues in
accordance with Jamison=s interpretation of the agreement because it deducted
expenses from net revenues.  However,
Jamison proved that he was not due any share of net revenues during 1992
because his $500,000 would not have been Achewed
up@ until the end of that year.  By that time, when he was due a share of net
revenues, the revenues had been frozen. 
Therefore, as we have explained, the evidence does not conclusively
prove that the breach did not occur at that time because XCO did not have
access to the revenues, and, thus, did not refuse to pay Jamison his share.
Further, XCO notes that Jamison received a check for $67,827 in June 1992,
which was inconsistent with Jamison=s
interpretation of the agreement because his investment had not been Achewed up.@  However, XCO admitted that its 1992
statements also contained errors.  Craig
Crawford and Shelly Cashion both contacted XCO=s
accountant about the errors and were told that the errors would be corrected
when the books closed at the end of the year. 
Finally, considering that Jamison=s cause
of action is based on XCO=s failure to pay him moneys owed, we cannot conclude
that a breach occurred when XCO paid him money that was not even owed.





[17]  On appeal, XCO
contends for the first time that the provision applies to accounting disputes
between XCO and Jamison because Gray was an officer of both XCO and
Southampton, Southampton issued Jamison=s
checks, and Southampton sent Jamison accounting statements from the same
address as XCO.  We note the accounting
statements, which we previously discussed, do say ASouthampton Mineral Corporation@ at the top. 
Under ASouthampton Mineral Corporation,@ they say AOwner: XCO/Jamison
Partnership.@  Therefore,
they appear to be Southampton=s statements to the XCO/Jamison Partnership.  However, the statements also appear to
calculate Jamison=s interest in the XCO/Jamison partnership.  The Astatute
of limitations clause@ in the operating agreements provides that Aall . . . statements rendered to Non-Operators by
Operator . . . shall conclusively be presumed to be true and correct@ after a certain time period.   However, considering that this provision
governs accounting between the operator and non-operator, it does not  impose a limitations period on Jamison simply
because the accounting between XCO and Jamison was included on the accounting
statements between Southhampton and the XCO/Jamison partnership.  Further, XCO is attempting to make some type
of alter ego argument.  We need not
address an alter ego theory because the operating agreements state, and XCO
admitted, that Southampton, not XCO, was the operator.