IN THE

TENTH COURT OF APPEALS




 
 
 
 
 
 
 


 



No. 10-06-00294-CR

 

Larry Darnell Allen,

                                                                                    Appellant

 v.

 

The State of Texas,

                                                                                    Appellee

 

 



From the 272nd District Court

Brazos County, Texas

Trial Court No. 05-06008-CRF-272

 



CONCURRING AND DISSENTING Opinion










 

            In this case we must reconcile two
lines of Court of Criminal Appeals’ opinions.  First is the line of cases which
holds that if the State fails to meet its burden of proof to establish an
enhancement allegation, “a harmless error analysis should not be undertaken.”  Russell
v. State, 790 S.W.2d 655, 656 (Tex. Crim. App. 1990).  As Justice Vance
notes, it appears to have been recently reaffirmed in Fletcher v. State,
214 S.W.3d 5, 8 (Tex. Crim. App. 2007).  The other line of cases is that
“[e]xcept for certain federal constitutional errors labeled by the United
States Supreme Court as ‘structural,’ no error, whether it relates to
jurisdiction, voluntariness of a plea, or any other mandatory requirement, is
categorically immune to a harmless error analysis.”  Cain v. State, 947
S.W.2d 262, 264 (Tex. Crim. App. 1997).  This line of cases has far more
subsequent citations than the other and was also recently reaffirmed in Garrett
v. State, 220 S.W.3d 926, 931 (Tex. Crim. App. 2007).

            It appears to me that the resolution may
depend upon the question.  In Fletcher, the State argued that the
appellate court could take judicial notice of its own mandate from another
proceeding that would appear to make the judgment used for enhancement final.  Taking
judicial notice would result in holding there was no error in using the
conviction for enhancement purposes.  Judge Keasler, writing for a unanimous
Court of Criminal Appeals, held that consistent with prior precedent, the court
of appeals had erred by taking judicial notice of its mandate in another
proceeding.  Fletcher v. State, 214 S.W.3d 5, 8-9 (Tex. Crim. App. 2007). 
The Court held, and rightly so, that “[i]f we allowed this practice, the State
would essentially be relieved of its burden of proving the finality of an
enhancement conviction at trial.”  Id. at 8.  In its discussion of the potential
for harm, the Court focused on whether the defendant was being deprived of the
right to respond to the State’s proof via introduction of the mandate to prove
finality.  The Court concluded “Fletcher’s precise argument on remand is not
important.”  Id. at 9.  Thus, the Court of Criminal Appeals was holding
that the defendant would be deprived of the right to contest the use of the
enhancement finding if the appellate court could take judicial notice of
something from another case, like a mandate, to prove finality of the
conviction and then use that prior conviction for enhancement.

            In the present case, however, the
State is not arguing that we should use the enhancement finding.  Rather, the
State is arguing that we should conduct a harm analysis after throwing out the
enhancement finding in its entirety on the premise that it was not properly
proven.[1] 
This appears to be an entirely reasonable position and one used by at least two
other courts of appeals after Russell was decided.  Holt v. State,
899 S.W.2d 22 (Tex. App.—Tyler 1995, no pet.); Boone v. State, No.
06-03-00250-CR, 2005 WL 598752 (Tex. App.—Texarkana, March 16, 2005, pet.
ref’d) (not designated for publication).  While these cases were not decided on
the failure of the State to meet its burden of proof, both conducted a harm
analysis after an enhancement finding was determined to be erroneous.  In each
case, the appellate court was able to conduct a meaningful harm analysis of the
impact of the error on the judgment, i.e., the sentence imposed.  In
each case, the error in the affirmative finding as it related to the
enhancement allegation was determined to be harmless.

            In the present case, the majority
conducted a harm analysis and determined the error was harmless.  But the
majority also concluded it was bound by Russell and Fletcher. 
Because there is no discussion of the Cain to Garrett line of
cases in Fletcher, and because the Cain line of cases has been
more frequently cited and more recently reaffirmed, I would apply Cain
and its progeny, conduct a harmless error analysis, hold the error is harmless
in reliance on Holt and Boone, and affirm the conviction and
punishment.  Accordingly, I concur in the affirmance of the judgment of
conviction but must respectfully dissent from the reversal for a new punishment
hearing.

 

                                                                        TOM
GRAY

                                                                        Chief
Justice

 

Concurring
and dissenting opinion delivered and filed August 22, 2007

Publish









[1] 
As the majority notes in footnotes 2 and 3,
the proper range of punishment without the second enhancement is 5-99 years
rather than 25-99 years.  Allen was sentenced to 75 years.








>
O P I N I O N
                                                                                                                

      This is a summary judgment case. Double Diamond, Inc. is the owner and developer of a
subdivision called White Bluff, to which Hilco Electric Cooperative, Inc., a non-profit electric-
cooperative corporation, provides electricity. Tex. Util. Code Ann. § 161.001-.054 (Vernon
1998 & Supp. 2004). A dispute arose when Double Diamond objected to Hilco’s charges for
extensions of distribution lines and other facilities required to provide electricity to White Bluff. 
The trial court granted Hilco’s motion for summary judgment in the amount of $439,456.28. We
will sustain Double Diamond’s challenge, reverse the judgment, and remand the cause.
BACKGROUND
      In the early 1990s, Double Diamond began the development of White Bluff, a primarily
residential subdivision, on land it owned in Hill County. Hilco, the sole provider of electricity
to White Bluff, constructs underground and overhead electric distribution lines and other facilities
and charges for this construction. For many years, Double Diamond and Hilco dealt with each
other under an oral agreement concerning what charges Hilco would make for construction work
to extend its distribution system. Randy Gracy, an officer of Double Diamond, worked out the
arrangements with successive general managers of Hilco—first Sam Houston and later Joe
Forman.
      In August 1996, while Forman was still general manager, the parties signed a written
agreement. The agreement provided for a substantial discount on charges Double Diamond would
pay for construction to extend Hilco’s distribution system in relation to the standard charges listed
in Hilco’s Tariff.


 The monthly revenue Hilco derived from electricity use in White Bluff was so
substantial that Hilco was willing to forego some of its usual charges for construction. The written
agreement states that “upon termination [of the agreement], [Hilco’s] approved tariffs will be in
effect.” The agreement expired by its express terms in August 1997, but in November 1997, the
parties extended it by written agreement. The extension agreement states that the parties “agree
to extend the terms of the [agreement] on the same terms and conditions . . . until August 2,
1998.” When the extension expired in August 1998, Double Diamond inquired about extending
it again but received no answer from Hilco. Summary judgment evidence shows, however, that
from August 2, 1998, until August 23, 2000, the parties continued to deal with each other just as
they had under the 1996 written agreement.
      On August 23, 2000, Hilco’s general manager since June 1999, Gerald Lemons, sent Double
Diamond a letter which stated: “effective immediately, new construction or member requested
upgrades . . . will be accomplished utilizing a Contribution-In-Aide to Construction (CIAC)
method,” which is the procedure in the Tariff for extending Hilco’s distribution system.


 In
November 2000, Lemons sent another letter, this time demanding payment of $484,229.24 for
work that had been performed to extend the distribution system since August 1998. Hilco later
claimed that the charges were due under the terms of its Tariff for extensions of the distribution
system made during the two years in dispute and that it had failed to adequately bill Double
Diamond. Hilco demanded payment before it would construct any new electrical lines or
facilities, but Double Diamond refused to pay. Thus, this dispute is about whether Hilco was
entitled to be paid for construction work done between August 2, 1998, and August 23, 2000,
according to the rates in the Tariff or whether some other agreement governed the amounts Double
Diamond was obligated to pay.



      Double Diamond continued to refuse Hilco’s demands and lodged a complaint with the Texas
Public Utilities Commission, which took no corrective action against Hilco. In May 2001, Double
Diamond sued Hilco in Travis County for injunctive relief to require Hilco to resume construction
of additional electrical lines and facilities, for tortious interference, and for a declaratory judgment
that it owed Hilco nothing in damages.


 Hilco filed a counterclaim for $381,610.21.


 In amended
pleadings, which included sworn denials under Rules of Civil Procedure 93(10) and 185, Double
Diamond asserted that: (a) by implication after August 1998, the terms of the 1996 written
agreement had been extended or a new agreement entered into incorporating the same terms, and
those terms controlled rather than those in the Tariff; (b) some of the back-charges Hilco was
demanding were for services not rendered for or to Double Diamond; and (c) some of the back-charges were barred by limitations.
      Hilco filed a motion for summary judgment based on theories of breach of contract, suit on
a sworn account, and quantum meruit. It also requested that Double Diamond’s suit for
declaratory relief be denied. Double Diamond filed a motion for partial summary judgment
claiming that any charges for services performed more than six months prior to September 1,
1999,


 were barred by limitations. In May 2002, the trial court granted Hilco’s motion for
summary judgment in the amount of $439,456.28, which apparently included $75,000 in
attorney’s fees. The court denied Double Diamond’s motion for partial summary judgment.



STANDARD OF REVIEW
      “Rule 166a provides a method of summarily terminating a case when it clearly appears that
only a question of law is involved and that there is no genuine fact issue.” Rhone-Poulenc, Inc.
v. Steel, 997 S.W.2d 217, 222 (Tex. 1999). The movant has the burden to prove by summary-judgment evidence that “there is no genuine issue as to any material fact and the moving party is
entitled to judgment as a matter of law on the issues expressly set out in the motion.” Id.; Nixon
v. Mr. Property Management Co., 690 S.W.2d 546, 548 (Tex. 1985); Tex. R. Civ. P. 166a(c).
      We review a summary judgment de novo. Rucker v. Bank One Texas, N.A., 36 S.W.3d 649,
653 (Tex. App.—Waco 2000, pet. denied). In conducting our review, we must accept as true all
evidence that is favorable to Double Diamond and resolve all doubts and indulge every reasonable
inference regarding the existence of a genuine issue of fact in favor of Double Diamond. Rhone-Poulenc, Inc., 997 S.W.2d at 223; Nixon, 690 S.W.2d at 548-49.
HILCO’S MOTION FOR SUMMARY JUDGMENT
      Hilco’s motion for summary judgment asserted there was no fact dispute on its claims of
breach of contract, suit on a sworn account, and quantum meruit. The order granting summary
judgment does not state under which theory it was granted. When the trial court does not specify
the basis for the summary judgment, we will affirm it if any of the movant’s grounds has merit. 
FM Properties Operating v. City of Austin, 22 S.W.3d 868, 872-73 (Tex. 2000); Star-Telegram,
Inc. v. Doe, 915 S.W.2d 471, 473 (Tex. 1995). Thus we will address all three grounds.
Breach of Contract
      Double Diamond asserts: (1) after August 1998, the parties’ agreement for extensions of
Hilco’s distribution system was an implied agreement, the terms of which were identical to the
August 1996 written agreement, and therefore the rates and charges which had applied the
previous two years controlled, rather than those of the Tariff; and (2) if the Tariff controlled, the
amounts demanded by Hilco are inaccurate, because not all the charges billed were for services
to or for the benefit of Double Diamond. Finding it dispositive, we will address the first of these
two contentions.
The Tariff:
      Under the terms of the Tariff, a person desiring to purchase electricity from Hilco must (1)
file an “application for membership,” (2) apply for service by signing Hilco’s “Electric Service
Agreement,” and (3) provide Hilco with any easement necessary. The Electric Service Agreement
incorporates the terms of the Tariff. The grant of the application operates as Hilco’s acceptance
of the Member’s offer to purchase electric service. The Electric Service Agreement, which
includes the terms of the Tariff, and the easement specify the terms of the “contract” between
Hilco and the Member regarding electric service to the Member’s residence or to a commercial
or industrial installation.


 The tariff also provides for payment of the cost to extend distribution
lines, which varies according to the status of the facility to be served: permanent single family
residence, non-permanent residence, commercial or industrial installation, or subdivision
development or mobile-home park. White Bluff is a subdivision development.
      The Tariff provides: “Usually the extensions provided for developers of a subdivision are
largely primary voltage facilities. Arrangements for extensions of secondary voltage facilities are
handled with individual Members under the appropriate residential or commercial policy.” The
Tariff provides that the developer will pay the actual cost of construction, less $1,200, prior to the
commencement of construction. Under the Tariff, Double Diamond is a “developer.”
Contract: Express or Implied?
      To establish that the Tariff controls, Hilco says that the Tariff itself is the contract. 
Alternatively, it points to the express language in the 1996 written agreement, affirmed in the
extension agreement, that says “upon termination [of the agreement], [Hilco’s] approved tariffs
will be in effect.” Third, Hilco refers us to section 304.4 of the Tariff which says the “contract
for electric service may be modified or terminated by the agreement of both [Hilco] and the
member if such agreement is made in writing and signed by both parties.”
      Double Diamond, to support its argument that fact issues exist about whether the parties had
an implied agreement to continue under the terms and conditions of the 1996 written agreement,
refers us to deposition testimony and affidavits from employees of both Double Diamond and
Hilco. These witnesses state that the parties continued to deal with each other from August 1998
to August 2000, just as they had under the 1996 written agreement. Further, this summary
judgment evidence shows that Hilco never charged Double Diamond under the Tariff for the
extension of distribution lines and facilities during that period. Finally, Double Diamond argues
that Lemons, in his August 2000 letter, said “effective immediately” the terms of the Tariff
controlled, thereby implying that they had not previously controlled.
      We do not agree with Hilco’s primary contention that the Tariff, standing alone, is a contract. 
The Tariff is a unilateral, one-party document. Some agreement of another party is necessary to
create a contract. That is usually the Electric Service Agreement. However, we believe that in
the absence of any written agreement, an implied agreement would exist between Hilco and a
person or entity to whom Hilco began furnishing electricity or other services under the Tariff.


 
By its express terms, Hilco’s Tariff is only part of whatever agreement exists between Hilco and
another party.
      Hilco points to no express agreement in the record between itself and Double Diamond, other
than the August 1996 agreement and the 1997 extension, that would impose the charges provided
by the Tariff for extensions of the distribution system to serve White Bluff between August 1998
and August 2000.


 Hilco does not contend that the terms of its Tariff cannot be modified.


 
Rather, its alternative contention is that termination language of the written 1996 agreement re-imposed the charges provided by the Tariff on all extensions of the distribution system requested
by Double Diamond after August 2, 1998. In the absence of another agreement that might be true,
but Double Diamond asserts an implied agreement containing contrary terms and conditions. 
Thus, we turn to a consideration of the legal authority for the existence of an implied agreement.
      Double Diamond relies on Emmer v. Phillips Petroleum Co., 668 S.W.2d 487 (Tex.
App.—Amarillo 1984, no writ). There, the court observed that when a contract is implied in fact,
the law finds a mutual intent to contract from the facts and circumstances of the case. Id. at 490
(citing Haws & Garrett G. Con., Inc. v. Gorbett Bros. Weld. Co., 480 S.W.2d 607, 609 (Tex.
1972)). Whether that mutual intent exists, however, is a question of fact. Id. The court
continued:
The situation becomes more complex when parties initially operate under an express contract,
but continue to operate in essentially the same manner after the express contract has expired. 
Although there is scant Texas law on the problem, other jurisdictions have held that, after
expiration of the express contract, the rights of the parties are to be determined under implied
contract principles. Although their conduct may permit a finding that the parties have
impliedly agreed that their rights should continue to be measured by the old contract, those
rights arise from the new implied contract, not the old expired contract. 

Id. Other courts imply an extension of the former contract. For example, Sieber & Calicutt, Inc.
v. La Gloria Oil & Gas Co. involved a maintenance contract for services at a refinery owned by
La Gloria. Sieber & Calicutt, Inc. v. La Gloria Oil & Gas Co., 66 S.W.3d 340, 344 (Tex.
App.—Tyler 2001, pet. denied). For more than a year after the contract expired by its own terms,
Sieber continued to perform maintenance services at the refinery and sent La Gloria invoices for
those services. Id. La Gloria continued to pay the invoices. Id. A La Gloria employee died at
the refinery after the contract’s expiration date, and a dispute arose about whether an indemnity
agreement in the contract was still in effect. Id. at 347. The Tyler Court held that, because the
parties continued to perform under the contract after it had expressly expired, the indemnity
provision of the contract was in effect on the date of the employee’s death. Id. The court said,
“An extension of time for performance may be implied as well as express. . . . When the exact
duration of an extension of time is not express, the law will imply a reasonable time. . . . The
extension of a term of a contract is the extension of all of its provisions.” Id. (citations omitted);
see also Triton Commercial Prop., Ltd. v. Norwest Bank Texas, N.A., 1 S.W.3d 814, 818 (Tex.
App.—Corpus Christi 1999, pet. denied) (extension of time for performance may be implied as
well as express).
      We find no authority, and Hilco has directed us to none, prohibiting parties from impliedly
extending an agreement or entering into a new agreement after a written agreement expires.
      Last, we reject Hilco’s assertion that section 304.4 of the Tariff requires a written agreement
to modify the Tariff. That section, by its plain terms, applies to agreements between Hilco and
its members for “electric service.” Furthermore, a written agreement not required by law to be
in writing may be modified by a later oral agreement, even though it provides that it can be
modified only in writing.” Mar-Lan Industries, Inc. v. Nelson, 635 S.W.2d 853, 855 (Tex.
App.—El Paso 1982, no writ); Adams v. Can-Dee Oil Corp., 357 S.W.2d 808, 808 (Tex. Civ.
App.—Waco 1962, writ ref’d n.r.e.).
      Having found authority for and no prohibition against the existence of an implied agreement
between Hilco and Double Diamond, our next inquiry is whether there is summary judgment
evidence to create a fact issue or issues about the existence of such an agreement.
      As we have noted, to prove the establishment of a contract, there must be evidence of a
mutual agreement between the parties. Haws & Garrett G. Con., Inc., 480 S.W.2d at 609. When
that evidence consists of the conduct of the parties and their course of dealing with one another,
then mutual agreement may be inferred from the circumstances, in which event the contract is said
to be “implied” as opposed to being an “express” contract. Id. The existence of an implied
contract, involving as it does an inference from circumstantial evidence, is a question of fact. Id.
at 609-10.
      Here, Double Diamond brought forward summary judgment evidence to show that the parties
continued for two years after August 1998 to deal with each other exactly as they had under the
1996 written agreement. Summary judgment proof also shows that Hilco never indicated until
August of 2000 that it intended to charge under the Tariff for the extension of its distribution
system during the period in question. Finally, in his August 2000 letter, Lemons said “effective
immediately” the procedures in the Tariff controlled, thereby implying that they had not
previously controlled.
      Based on this evidence and allowing Double Diamond the benefit of all doubts and reasonable
inferences, we find that there is a genuine fact issue about whether the parties entered into an
implied agreement after August 2, 1998, which continued the former rates and charges rather than
those in the Tariff. Tex. R. Civ. P. 166a(c); Rhone-Poulenc, Inc., 997 S.W.2d at 222. 
Therefore, the trial court erred in finding as a matter of law that Hilco was entitled to charge the
Tariff rates for construction work done between August 2, 1998, and August 23, 2000.
Statute of Frauds
      Hilco’s reply to Double Diamond’s response to the motion for summary judgment raises one
additional question we will address: whether such an implied agreement would violate the statute
of frauds. An oral agreement which is not to be performed within one year is not enforceable. 
Tex. Bus. & Com. Code Ann. § 26.01(a)(6) (Vernon 2002). However, “[i]f a contract can, from
the terms of the agreement, be performed within one year it is not within the Statute of Frauds.” 
Miller v. Riata Cadillac Co., 517 S.W.2d 773, 775 (Tex. 1974). The summary-judgment record
does not conclusively establish that the implied agreement could not have been performed within
one year. If an oral indefinite-term employment contract is not prohibited by the statute of frauds,
we fail to see why an oral indefinite-term contract to extend distribution lines should be. See id. 
Thus, we reject Hilco’s statute-of-fraud assertions and proceed to its assertions that it is entitled
to recover because it presented a sworn account or on its theory of quantum meruit.
Suit on a Sworn Account
      A suit on a sworn account is a suit in which the rules of civil procedure control evidentiary
matters; specifically, proof of certain facts is presumed if the plaintiff’s pleadings contain certain
sworn assertions, as Hilco’s do, and the defendant does not file a sworn denial of those assertions. 
Tex. R. Civ. P. 185; Rizk v. Financial Guardian Ins. Agency, Inc., 584 S.W.2d 860, 862 (Tex.
1979); Worley v. Butler, 809 S.W.2d 242, 244-45 (Tex. App.—Corpus Christi 1990, no writ)
(elements of suit on sworn account). It is not a rule of substantive law. Rizk, 584 S.W.2d at 862. 
If the sworn denials are filed, as Double Diamond did, the evidentiary effect of the itemized
account is destroyed, and the party must prove its claim. Id. Here, that claim sounds in contract
law, an issue we have already addressed. See Hou-Tex Printers, Inc. v. Marbach, 862 S.W.2d
188, 190 (Tex. App.—Houston [14th Dist.] 1993, no writ) (defining and describing what qualifies
as suit on sworn account). In the absence of a conclusive showing of the right to recover the
Tariff amounts and in the face of the sworn denials, summary judgment on this basis would be
improper.
Quantum Meruit
      Quantum meruit is an equitable remedy which applies when the plaintiff has performed
services for and provided materials to the defendant, and the defendant has been unjustly enriched
thereby. Vortt Exploration v. Chevron U.S.A., 787 S.W.2d 942, 944 (Tex. 1990); Harker
Heights, Tex. v. Sun Meadows Land, 830 S.W.2d 313, 318 (Tex. App.—Austin 1992, no writ). 
If the delivery of services and materials, and payment for them, are governed by a valid contract,
the action sounds in contract, not quantum meruit. Id.; Truly v. Austin, 744 S.W.2d 934, 936
(Tex. 1988). The dispute between Hilco and Double Diamond is one concerning failure to pay
under a contract, the terms of which are in dispute. Therefore, summary judgment on the basis
of quantum meruit would be improper.
Amount of Damages
      Because we will reverse the summary judgment after finding a fact issue about the existence
of an implied agreement, we do not address Double Diamond’s argument attacking the amount of
the damages awarded.
DOUBLE DIAMOND’S MOTION FOR PARTIAL SUMMARY JUDGMENT
      We will likewise not review Double Diamond’s assertion that its motion for partial summary
judgment should have been granted. Double Diamond’s motion sought only a declaration
regarding limitations as to part of the damages claimed by Hilco; it did not request a final
disposition of all its claims. On appeal, we may not consider cross-motions for summary
judgment that do not seek a final disposition of all claims in the trial court. See Montgomery v.
Blue Cross & Blue Shield, 923 S.W.2d 147, 152 (Tex. App.—Austin 1996, writ denied) (en banc)
(refusing to render judgment based on cross-motion for partial summary judgment because motion
did not seek final disposition of claims in trial court); see also Runyan v. Mullins, 864 S.W.2d
785, 790 (Tex. App.—Fort Worth 1993, writ denied).
            BILL VANCE
                                                                   Justice
Before Chief Justice Gray, and
      Justice Vance
      (Former Chief Justice Davis not participating)



Reversed and remanded
Opinion delivered and filed December 17, 2003
[CV06]